Slip Op. 21-12

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL STEEL PRODUCTS, INC., et al., | |
| **Plaintiffs,** | **Before: Gary S. Katzmann, M. Miller Baker, and Leo M. Gordon, Judges** |
| v. | |
| THE UNITED STATES, et al., | **Court No. 19-00209** |
| **Defendants.** | |

## OPINION and ORDER

[Defendants' motion for judgment on the pleadings is granted; Plaintiffs' motion for partial summary judgment is denied.  Judge Katzmann, with whom Judge Gordon joins, files a separate concurrence.  Judge Baker files a separate opinion concurring in part and dissenting in part.]

Dated: February 4, 2021

Lewis E. Leibowitz, the Law Office of Lewis E. Leibowitz, of Washington, DC, argued for plaintiffs.

Meen Geu Oh, Trial Attorney and Ann C. Motto, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With them on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, Tara K. Hogan, Assistant Director, and Stephen C. Tosini, Senior Trial Attorney.

Per Curiam:[1] The primary question before us is whether Proclamation 9705 and a series of subsequent modifications to it issued by the President, imposing heightened tariffs on steel imports on the grounds that they threaten to impair the national security of the United States, violate Section 232 of the Trade Expansion Act of 1962, codified as amended at 19 U.S.C. § 1862

---

[1] Judge Baker joins all but footnotes 6 and 14 and Section III of this opinion.

("Section 232").  We conclude that Proclamation 9705 and its subsequent modifications do not violate that statute.

Plaintiffs Universal Steel Products, Inc., PSK Steel Corporation, The Jordan International Company, Dayton Parts, LLC, and Borusan Mannesman Pipe U.S. Inc. (collectively, "Plaintiffs") are U.S. corporations that import steel from foreign nations and claim injury based on tariffs imposed by the President under Section 232.  Am. Compl. at 1, Dec. 11, 2019, ECF No. 11. Plaintiffs brought this action against naming as defendants the United States, and various officers of the United States in their official capacities (the President of the United States, the Secretary of Commerce, and the Acting Commissioner of Customs and Border Protection) (collectively, "the Government"), seeking equitable and legal relief for tariffs on certain steel products.  Am. Compl. at 1.  To defeat Plaintiffs' challenge to these Proclamations, the Government moved for judgment on the pleadings.  Def.'s Mot. for J. on the Pleadings at 7, Apr. 9, 2020, ECF No. 32 ("Def.'s Br."). Plaintiffs oppose this motion.  Pls.' Br. in Opp'n to Def.'s Mot. for J. on the Pleadings, Apr. 28, 2020, ECF No. 35 ("Pls.' Br.").  Plaintiffs have also filed a cross-motion for partial summary judgment.  Pls.' Cross-Mot. for Summ. J., Oct. 12, 2020, ECF No. 56.

## BACKGROUND

### I.      *Legal and Regulatory Framework for Action Under Section 232 Generally*

With its genesis in the Cold War, Section 232 was enacted by Congress in 1962, authorizing the President to adjust imports that pose a threat to the national security of the United States.  Section 232 directs that, upon receipt of a request from the head of a department or agency, upon application of an interested party, or sua sponte, the Secretary of Commerce is to conduct an "appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request."  19 U.S.C. § 1862(b)(1)(A).  The Secretary shall, "if it is

appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties

an opportunity to present information and advice relevant to such investigation." 19 U.S.C.

§ 1862(b)(2)(A)(iii). The Secretary of Commerce must "provide notice to the Secretary of

Defense" of the investigation's commencement and, in the course of the investigation, "consult

with the Secretary of Defense regarding the methodological and policy questions raised[.]"

19 U.S.C. § 1862(b)(1)(B); 19 U.S.C. § 1862(b)(2)(A)(i). The Secretary of Commerce must also

"(ii) seek information and advice from, and consult with, appropriate officers of the United States,

and (iii) if it is appropriate and after reasonable notice, hold public hearings or otherwise afford

interested parties an opportunity to present information and advice relevant to such investigation."

19 U.S.C. § 1862(b)(2)(A)(ii)–(iii).

    The statute provides that, within 270 days of commencing the investigation, the Secretary

shall submit a report to the President summarizing the investigation's findings and offering

recommendations for action or inaction; in addition, if the Secretary concludes the subject article's

imports are in quantities or under circumstances that "threaten to impair the national security,"

the report shall indicate that finding. 19 U.S.C. § 1862(b)(3)(A). If the Secretary finds a threat to

national security, the President then has ninety days from his receipt of the report to determine

whether he concurs with the Secretary's finding. 19 U.S.C. § 1862(c)(1)(A)(i). If the President

concurs, he must "determine the nature and duration of the action that, in the judgment of the

President, must be taken to adjust the imports of the article and its derivatives so that such imports

will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii). If the President

elects to take such action, the statute provides he shall "implement" that action within fifteen days

after the day on which he decides to act. 19 U.S.C. § 1862(c)(1)(B). If the action chosen by the

President is to negotiate an agreement with a foreign nation, and no such agreement is entered into

before the date that is 180 days after the date on which the President made the determination to

negotiate, or if the agreement is not being carried out or is ineffective, the President shall "take

such other actions as the President deems necessary to adjust the imports of such article so that

such imports will not threaten to impair the national security."  19 U.S.C. §§ 1862(c)(3)(A)(i)–(ii).

Finally, section (d) lists the following factors that the Secretary and the President are to consider

when acting pursuant to the statute:

> (d) **Domestic production for national defense; impact of foreign competition on economic welfare of domestic industries**
>
> For the purposes of this section, the Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(d).

## II.   *Facts and Procedural History*

On April 19, 2017, the Secretary of Commerce, Wilbur L. Ross, initiated a Section 232

investigation to determine the effects of steel imports on national security.  See Publication of a

Report on the Effect of Imports of Steel on the National Security, 85 Fed. Reg. 40,202, 40,208

(Dep't Commerce July 6, 2020) ("Steel Report").[2]   The Secretary issued his report and recommendation to the President on January 11, 2018, within 270 days of initiation of the investigation, as required by 19 U.S.C. § 1862(b)(3)(A).  See id.  The Secretary found that the availability of steel manufactured by a healthy domestic industry is important to national defense, that steel "[i]mports in such quantities as are presently found adversely impact the economic welfare of the U.S. steel industry, that the displacement of domestic steel by excessive quantities of imports has the serious effect of weakening our internal economy, and that global excess steel capacity is weakening the domestic economy."  Id. at 40,210.  In light of these findings, the Secretary recommended that the President act to adjust the level of imports through quotas or tariffs on steel imported into the United States.  Id. at 40,225.

The President, Donald J. Trump, concurred with the Secretary's findings and issued a series of Proclamations from March 8, 2018 to May 19, 2019.  The first, Proclamation 9705, announced measures aimed at "adjusting imports of steel into the United States," and established a twenty-five percent tariff on imports of steel articles from all countries except Canada and Mexico, effective March 23, 2018.  Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into The United States, 83 Fed. Reg. 11,625, cl. 9 (Mar. 15, 2018) ("Proclamation 9705").  Additionally, the President declared in Proclamation 9705 that "any country with which [the United States has] a security relationship could discuss alternative ways to address the threatened impairment of our national security caused by imports from that country."  Id

---

[2] Although the Secretary initially issued the Steel Report in 2018, see The Effect of Imports of Steel on the National Security (Dep't Commerce Jan. 11, 2018), publication in the Federal Register was delayed until 2020.

Thereafter, the President modified Proclamation 9705 on several occasions.  On March 22, 2018, the President issued Proclamation 9711 that temporarily exempted imports from Argentina, Australia, Brazil, the countries of the European Union ("EU"), and the Republic of Korea, in addition to Canada and Mexico, from the twenty-five percent tariff imposed by Proclamation 9705, pending negotiations with those countries.  Proclamation 9711 of March 22, 2018, Adjusting Imports of Steel Into the United States, 83 Fed. Reg. 13,361, ¶¶ 6–9 (Mar. 28, 2018) ("Proclamation 9711").  On April 30, 2018, the President issued Proclamation 9740 that continued exempting imports from Canada, Mexico, and the EU and replaced the tariff on steel imports from the Republic of Korea with quotas.  Proclamation 9740 of April 30, 2018, Adjusting Imports of Steel Into the United States, 83 Fed. Reg. 20,683, ¶ 5 (May 7, 2018) ("Proclamation 9740").  The President issued Proclamation 9759 on May 31, 2018 that imposed quotas on Brazil and Argentina based on agreements with those countries but did not mention any satisfactory alternative agreement with Canada, Mexico, or the EU.  Proclamation 9759 of May 31, 2018, Adjusting Imports of Steel Into the United States, 83 Fed. Reg. 25,857 (June 5, 2018) ("Proclamation 9759").  The temporary exemption on the imposition of tariffs on Mexico, Canada, and the EU was allowed to expire on June 1, 2018, and the twenty-five percent tariffs on steel imports from those countries, as set forth in Proclamation 9705, took effect.  See Proclamation 9711, ¶ 11; Proclamation 9740, ¶ 7; Proclamation 9705, cl. 2.  On August 10, 2018, the President further amended Proclamation 9705, based on a recommendation from the Secretary, and determined that certain countries should be subject to a higher tariff because of the need to further reduce steel imports from major foreign exporters, Turkey in particular.  Accordingly, the President increased the tariffs for steel imports from Turkey from twenty-five to fifty percent.  See Proclamation 9772 of August 10, 2018, Adjusting Steel Imports Into the United States, 83 Fed. Reg. 40,429, ¶ 6 (Aug. 15, 2018).  Shortly

thereafter, the President issued Proclamation 9777 that authorized the Secretary to permit specific exclusions to countries subject to quotas under previous Proclamations and authorized other modifications to the product exclusion process. Proclamation 9777 of August 29, 2018, Adjusting Imports of Steel Into the United States, 83 Fed. Reg. 45,025 (Sept. 4, 2018) ("Proclamation 9777"). Finally, on May 19, 2019, the President permanently excluded Mexico and Canada from these tariffs because of the conclusion of the United States-Mexico-Canada Agreement. Proclamation 9894 of May 19, 2019, Adjusting Imports of Steel Into the United States, 84 Fed. Reg. 23, 987 (May 23, 2019).[3]

Plaintiffs filed a four- count amended complaint on December 11, 2019, alleging that the Secretary's report and the President's Proclamations violated various procedural requirements of Section 232 and the Administrative Procedure Act ("APA"). See Am. Compl., Dec. 11, 2019, ECF No. 11.[4] The Government filed a motion for judgment on the pleadings pursuant to USCIT Rule 12(c) on April 9, 2020. Def.'s Br. at 2. Plaintiffs responded in opposition to the Government's motion on April 29, 2020. Pls.' Br. at 9–10. The Government filed a corrected reply brief on May 20, 2020. Def.'s Corr. Reply, May 20, 2020, ECF No. 39 ("Def.'s Corr. Reply"). Prior to oral argument, we issued questions to the parties, to which they filed written responses. See Pls.' Resp. to Questions from the Ct., July 17, 2020, ECF No. 45; Def.'s Resp. to

---

[3] We note that subsequent modifications of Proclamation 9705 followed. See, e.g., Proclamation 10060 of August 6, 2020, Adjusting Imports of Aluminum Into the United States, 85 Fed. Reg. 49,921 (Aug. 14, 2020). However, we limit our discussion and decision to the Proclamations referenced in the amended complaint. See Am. Compl. ¶¶ 45–55, Dec. 11, 2019, ECF No. 11.

[4] At the request of the parties, we stayed Count Four's challenge to Proclamation 9772 pending final resolution of an identical challenge in a separate case. Am. Compl. ¶ 71; Joint Status Report (and Proposed Briefing Schedule, Mar. 5, 2020, ECF No. 25; Scheduling Order, Mar. 10, 2020, ECF No. 26 ("Ordered that consideration of Plaintiffs' challenge to Presidential Proclamation 9772, as pleaded in Count Four of the Amended Complaint, Am. Compl. ¶ 71, is stayed pending the final disposition of Transpacific Steel, LLC v. United States, Ct. Int'l Trade No. 19-0009").

Ct.'s Order, July 17, 2020, ECF No. 44 ("Def.'s Resp."). We held oral argument on July 21, 2020.

ECF No. 46. Subsequently, in response to an order from the court, ECF No. 55, Plaintiffs filed a

cross-motion for partial summary judgment. Pls.' Cross-Mot. for Summ. J., Oct. 12, 2020, ECF

No. 56;[5] see also Ct. Letter, Sept. 25, 2020, ECF No. 49; Pls.' Resp., Oct. 4, 2020, ECF No. 51;

Def.'s Resp., Oct. 5, 2020, ECF No. 54.

## JURISDICTION and STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. §§ 1581(i)(2) and (4), which provide that this court

"shall have exclusive jurisdiction of any civil action commenced against the United States, its

agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs,

duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of

revenue" and "administration and enforcement with respect to the matters referred to in paragraphs

(1)–(3) of this subsection."

We may review a President's action pursuant to Section 232 for a "clear misconstruction

of the governing statute, a significant procedural violation, or action outside delegated authority."

See Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985). Such non-statutory

review of Presidential action for violation of a statute is "only rarely available." Silfab Solar, Inc.

v. United States, 892 F.3d 1340, 1346 (Fed. Cir. 2018).

"Judgment on the pleadings is appropriate where there are no material facts in dispute and

the party is entitled to judgment as a matter of law." Forest Labs., Inc. v. United States, 476 F.3d

---

[5] We directed that Plaintiffs' Cross-Motion for Partial Summary Judgment incorporate by reference Plaintiffs' response and revised response to Defendants' Motion for Judgment on the Pleadings, ECF Nos. 33, 35, as its memorandum in support of the cross-motion, and also directed, upon the filing of the cross-motion, that the Office of the Clerk deem Defendants' memorandum in support of their Motion for Judgment on the Pleadings, plus the attachment thereto, ECF Nos. 32, 32-1, and Defendants' Reply, ECF No. 36, as Defendants' response to Plaintiffs' cross-motion.

877, 881 (Fed. Cir. 2007) (citation omitted).  Summary judgment is appropriate "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  USCIT R. 56(a).

## DISCUSSION

Plaintiffs allege the following: (1) the Steel Report is a reviewable, final agency action,

is procedurally deficient, and invalidates subsequent Presidential action; (2) both the Secretary and

the President fundamentally misinterpreted the statute by failing to base their determinations on

an "impending threat;" (3) the President violated Section 232 by failing to set the duration of the

action he chose; and (4) tariffs imposed on Canada, Mexico, and EU member nations violated

Section 232's timing provisions.  Am. Compl. ¶¶ 56–70; Pls.' Br. at 5–46.  The Government

responds that (1) the Steel Report is not final agency action and is therefore not reviewable, but

even if it were, the Secretary followed all procedural requirements; (2) the statute does not require

the Secretary or President to identify an "impending threat;" (3) the President is not required by

the "duration" language of Section 232 to establish an end to the action at its outset; and (4) no

timing provisions of Section 232 were contravened, but even if they were, the President has the

discretion to do so.  Def.'s Br. at 2–4.  We hold that Plaintiffs' claims fail on the pleadings.[6]

---

[6] In his separate opinion, Judge Baker argues <u>sua sponte</u> that the President in his official capacity
should be dismissed from this litigation entirely, even for actions not arising under the APA.
Judges Katzmann and Gordon do not share that view.  Their position can be stated as follows:

The Government has not raised this issue, nor has it asserted under any theory that dismissal of the
President in his official capacity is warranted.  We do not construe the amended complaint to be
asserting claims against the President.  Rather, the claims are directed against the Proclamations
themselves, not the President, against whom no remedy is sought.  Plaintiffs do not ask that we
enjoin the President, but rather seek to enjoin the Secretary and the Acting Commissioner, U.S.
Customs and Border Protection.  Moreover, there is no dispute as to whether the court has
jurisdiction to entertain the requested relief -- to declare that the Proclamations are contrary to law
and invalid, to enjoin the enforcement of any quota, and to order refunds of any duties.  <u>See</u> Am.

I.       *The Steel Report is Not Final Agency Action and Thus Is Not Subject to Judicial Review Under the APA.*[7]

In Count One, Plaintiffs allege that the Secretary's Steel Report is a reviewable, final agency action, is procedurally deficient, and invalidates subsequent Presidential action. Count Two, paragraph 64, echoes the allegations of Count One except that it fails to allege that the Secretary's report is reviewable.[8] We find that the Steel Report is not reviewable as final agency action under the APA; thus, the Government is entitled to judgment as a matter of law as to these claims.

The APA provides that "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Two conditions must be satisfied for an agency action to be final. First, the action must mark the "consummation" of the agency's decision-making process -- it must not be of a merely tentative or interlocutory nature. Bennett v. Spear, 520 U.S. 154, 177–78 (1997); see also Franklin v. Massachusetts, 505 U.S. 788 (1992). Second, the action must be one by which "rights or

---

Compl. ¶ 72. We simply note that it does. Accordingly, we do not think it necessary for the court sua sponte to dismiss the President in his official capacity from this litigation.

[7] This section corresponds to Count One and Count Two, paragraph 64, of Plaintiffs' amended complaint. Am. Compl. ¶¶ 56–62, 64.

[8] Although Count Two, paragraph 64, arguably alleges a nonstatutory review claim -- which by definition is outside of the APA -- based on the Secretary's Steel Report, Plaintiffs' briefing does not argue that their challenge to the report is reviewable outside of the APA. Moreover, Plaintiffs have expressly clarified that their challenge to the Steel Report is limited to "whether the [Steel Report] is subject to judicial review[,] and . . . if so, whether the [Steel Report] violated the Administrative Procedure Act." Resp. to the Ct.'s Letter of Sept. 25, 2020 on Behalf of Pls. at 2, Oct. 4, 2020, ECF No. 51. Accordingly, we do not consider whether Plaintiffs' allegations against the Steel Report are reviewable outside of the APA, and we treat Count Two, paragraph 64, as duplicative of Count One's APA claim.

obligations have been determined" or from which "legal consequences will flow."   Bennett, 520 U.S. at 177–78.

In Franklin, the Supreme Court articulated the meaning of final agency action through a challenge to the method by which Congress apportioned seats in the U.S. House of Representatives based on a recommendation of the Secretary of Commerce, which was reviewed and approved by the President before taking effect.   505 U.S. 788.   The Court found that the Secretary of Commerce's recommendation was not reviewable "final agency action" under the APA.   Id. At 799.   In reaching its conclusion, the Court evaluated the "core question" of whether "the agency ha[d] completed its decision-making process, and whether the result of that process [was] one that will directly affect the parties."   Id. at 797.   Because the President had to submit the Secretary of Commerce's recommendation to Congress and had the opportunity to alter it before doing so, the Court held that the agency action "serve[d] more like a tentative recommendation than a final and binding determination."   Id. at 798.   The test was again articulated and used in Bennett, where the Court found that agency action pursuant to the Endangered Species Act was final and reviewable because the report in question "altere[ed] the legal regime to which the action agency is subject" and therefore had "direct and appreciable legal consequences."   520 U.S. at 178.

Plaintiffs, relying primarily on Corus Group PLC v. International Trade Commission, 352 F.3d 1351, 1358 (Fed. Cir. 2003), argue that judicial review of the Secretary's Steel Report is proper because the Steel Report affected rights and obligations of the President and legal consequences resulted.   See Pls.' Br. at 18.   The Government responds, contending that an agency action is not final if it is purely advisory and does not affect the legal rights of the parties, and that the Steel Report falls "squarely within the bounds of an advisory action."   Def.'s Br. at 19 (quoting Franklin, 505 U.S. at 798).   We agree with the Government that the issue is not controlled by Corus

<u>Group</u>, as Plaintiffs contend, but by <u>Franklin</u> and <u>Bennett</u>.  Moreover, this case is similar to other cases that held that agency recommendations to the President were not final action subject to judicial review.  <u>See generally</u> <u>Dalton v. Specter</u>, 511 U.S. 462 (1994) (holding that an agency's recommendation of military bases for closure was not a final decision and was not reviewable under the APA); <u>Michael Simon Design, Inc. v. United States</u>, 609 F.3d 1335 (Fed. Cir. 2010) (holding that the International Trade Commission's act of recommending that the President modify HTSUS was not final agency action); <u>Motion Systems Corp. v. Bush</u>, 437 F.3d 1356 (Fed. Cir. 2006) (holding that the Trade Representative's recommendations for presidential action pursuant to the Trade Act of 1974 were not final actions).  These cases, viewed together, suggest that the determinative factor is whether the recommendation itself carries direct consequences, or if a form of approval from the President is necessary before any consequences attach.  <u>See, e.g.</u>, <u>Michael Simon Design</u>, 609 F.3d at 1339; <u>Motion Systems Corp.</u>, 437 F.3d at 1362.

In <u>Corus Group</u>, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") held that a recommendation made by the U.S. International Trade Commission ("the Commission") to the President pursuant to the Trade Act of 1974 was reviewable because "the President does not have complete discretion under the statute, and the Commission's report had 'direct and appreciable legal consequences.'"  352 F.3d at 1359.  While the relevant statutory provision of the Trade Act of 1974 and Section 232 are strikingly similar, there is a key distinction: the Trade Act of 1974 does not give the President the option to accept or reject the finding of the Commission. 19 U.S.C. § 2253(a)(1)(A).  Rather, if an affirmative finding is issued by the Commission, the President is required to take action, although he may use his discretion in choosing the nature of the action.  <u>Id.</u>  The statute provides:

> After receiving a report under section 2252(f) of this title containing an affirmative
> finding regarding serious injury, or the threat thereof, to a domestic industry, the

> President shall take all appropriate and feasible action within his power which the
> President determines will facilitate efforts by the domestic industry to make a
> positive adjustment to import competition and provide greater economic and social
> benefits than costs.

19 U.S.C. § 2253(a)(1)(A).  In contrast, under Section 232, when the Secretary makes an affirmative

finding of a threat, the President is to first determine "whether [he] concurs with the finding of the

Secretary" before acting, as the relevant portion of the statute states:

> Within 90 days after receiving a report submitted under subsection (b)(3)(A) in
> which the Secretary finds that an article is being imported into the United States in
> such quantities or under such circumstances as to threaten to impair the national
> security, the President shall—(i) determine whether the President concurs with the
> finding of the Secretary, and (ii) if the President concurs, determine the nature and
> duration of the action that, in the judgment of the President, must be taken to adjust
> the imports of the article and its derivatives so that such imports will not threaten
> to impair the national security.

19 U.S.C. §§ 1862(c)(1)(A)(i)–(ii).  The statute at issue in Corus Group requires the President

to take action if an affirmative finding is issued. 352 F.3d at 359.  Therefore, the court's holding

in Corus Group that the Commission's recommendation was reviewable is not determinative here.

Section 232 gives the President the discretion to disagree with the Secretary's

recommendation and not take any action.  This case is thus more akin to Dalton v. Specter,

511 U.S. 462 (1994).  In Dalton, the Supreme Court held that recommendations for military base

closures, made by the Secretary of Defense pursuant to the Defense Base Closure and Realignment

Act of 1990, did not constitute final agency action because the President had to review and submit

a certificate of approval of those recommendations to Congress before they took effect.  511 U.S.

at 463.  The Court highlighted that "without the President's approval, no bases are closed under

the act" and that "what is crucial is the fact that the President, not the [agency], takes the final

action that affects the military installations."  Id. at 470.  Even though that statute limited the

President's discretion significantly in that he could only accept or reject the recommendations in

its entirety, the determinative fact, the Court found, was that the President's approval was the final, necessary step before any action occurred.  Id. ("That the president cannot pick and choose among bases, and must accept or reject the entire package offered by the Commission, is immaterial. What is crucial is the fact that '[t]he President, not the [agency], takes the final action that affects' the military installations.").

Similarly, in Michael Simon Design, the Federal Circuit heard a challenge to modifications that were made to the Harmonized Tariff Schedule based on the Commission's recommendations and held that the recommendations were not final, but it was the President's proclamation adopting the proposed modifications that constituted the final action.  609 F.3d at 1341.  Examination of the relevant statutory language reveals that, similar to the language of Section 232, the President had the option of choosing not to accept the recommendations at all: "the President may proclaim modifications, based on the recommendations by the Commission under section 3005 of this title, to the Harmonized Tariff Schedule if the President determines that the modifications -- (1) are in conformity with United States obligations under the Convention; and (2) do not run counter to the national economic interest of the United States."  19 U.S.C. § 3006(a).  Elaborating upon why the recommendations were not final, the Federal Circuit stated that the recommendations "[did] not contain terms or conditions that circumscribe the President's authority to act; [they did] not limit the President's potential responses, and . . . [did] not directly modify the HTSUS."[9]  Michael Simon Design, 609 F.3d at 1339.

---

[9] As noted, Dalton makes clear that even if the President's potential responses were limited by the recommendations, that would not mean that the agency action is final in itself.  See Dalton v. Specter, 511 U.S. at 470.  Because the President's discretion to act is not limited under Section 232 in the way it was by the statute at issue in Dalton, this suggests a fortiori that the agency's action was not final.

Finally, in Motion Systems Corp., the Federal Circuit held that the Commission and the U.S. Trade Representative's recommendations to the President were not final.  437 F.3d at 1359. The relevant statute in that case provides that if the Commission and the Trade Representative find a threat to the United States economy, they must submit a report to the President.  19 U.S.C. § 2451.  The statute provides that, within fifteen days of receiving the report, the President must "provide import relief . . . unless the President determines that provision of such relief is not in the national economic interest of the United States."  19 U.S.C. § 2451(k)(1).  This statutory provision cabins the President's authority to reject the recommendations more than Section 232 does because Section 232 does not articulate any criteria upon which the President must base his decision. Notably, and pertinent to the case now before us, the court still held that the agency's actions were only recommendations for Presidential action, and thus not reviewable.  Motion Systems, 437 F.3d at 1362.  Like the recommendations to the President in Dalton, Michael Simon Design, and Motion Systems, the Secretary's findings and recommendations at issue here did not require the President to take any action; rather, Section 232 left to the President's discretion whether to concur with the findings and recommendations.  The imposition of tariffs, which is the action that gave rise to the legal consequences that Plaintiffs challenge, was an action taken by the President, and not by the Secretary.  In conclusion, the Steel Report is not reviewable under the APA, and the Government is entitled to judgment on the pleadings as to Count One and Count Two, Paragraph 64, of the amended complaint.[10]

---

[10] Even if Plaintiffs' challenge to the Steel Report were reviewable (under the APA or otherwise) and even if the court were to find that the Steel Report was procedurally flawed, precedent reveals that such a finding would not allow the court to invalidate the subsequent Presidential action.  See Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1345 (Fed. Cir. 2018).  In Silfab Solar, the Federal Circuit plainly rejected the contention that failure of the Commission to comply with procedural statutory obligations when reporting to the President invalidates subsequent

## II.      *"Impending Threat" and the Validity of the President's Actions*[11]

Plaintiffs allege that the President "fundamentally misinterpreted Section 232 by failing to base his determination upon a finding of an impending threat to impair the national security of the United States."  Am. Compl. ¶ 68; Pls.' Br. at 32–34.  Plaintiffs challenge the President's action after he concurred with the Secretary's recommendations, contending that the President's failure to find an "impending" threat violated the statute.  Id.[12]

As Plaintiffs correctly indicate, Section 232 requires the President to concur with a finding by the Secretary that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security" before the President may take action.  Pls.' Br. At 32; 19 U.S.C. §§ 1862(b)(3)(A); (c)(1)(A)(ii).[13]  Plaintiffs contend that the ordinary meaning of the word "threat" is "something impending," and further, that this is the only

---

Presidential action.  Id.  When nothing in the relevant statute requires the President to determine whether procedural violations were committed by the agency making a recommendation to the President, or prohibits the President from approving recommendations that are procedurally flawed, courts have repeatedly held that the court cannot overturn the resulting Presidential action on the basis of such a procedural violation.  See Michael Simon Design, 609 F.3d at 1342–43; see also Dalton, 511 U.S. at 476.  Section 232 does not contain any requirements to that effect, and thus, even a concrete finding of a procedural violation by the Secretary would not enable the court to overturn the President's actions.  See generally 19 U.S.C. § 1862.

[11] This section corresponds to Count Three of Plaintiffs' amended complaint.  Am. Compl. ¶¶ 67–68.

[12] Plaintiffs similarly allege the Secretary similarly violated the statute in failing to find an impending threat, but that claim -- as one aspect of Plaintiffs' broader APA claim -- is not reviewable for the reasons provided above.

[13] Section 1862(b)(3)(A) refers to the Secretary's duties and provides that: "[i]f the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report."  Section 1862(c)(1)(A)(ii) refers to the President's duties, and provides: "if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."

definition that can apply to "imports."  Pls.' Br. at 33–34 (citing Threat, Merriam-Webster Online

Dictionary,  https://www.merriam-webster.com/dictionary/threat  (last  visited  Jan.  27,  2021)).

Plaintiffs further argue that "in the context of Section 232, the 'threat' of impairment of national

security cannot be distant in time or conjectural -- it must be both genuine and 'impending.'"  Id.

      Section 232, however, grants the President latitude in evaluating whether imports threaten

the national security.  The statutory language makes clear that the list of factors to be considered

in determining whether a threat exists is nonexclusive.  19 U.S.C. § 1862(d) ("the President shall,

in the light of the requirements of national security and without excluding other relevant factors

. . . ").

      An examination of Proclamation 9705 and its subsequent modifications reveals that the

President made findings after considering recommendations from the Secretary that addressed data

relevant to the factors provided by the statute, such as the domestic production needed for projected

national defense requirements, the capacity of domestic industries to meet such requirements, and

the serious effects resulting from the displacement of any domestic products by excessive imports.

See Def.'s Br., Exh. 1 at 25–53 (The Effect of Imports of Steel on the National Security. U.S.

Dep't of Commerce (Jan. 11, 2018)).  Generally, the President's exercise of discretion is not open

to scrutiny.  See United States v. George S. Bush & Co., 310 U.S. 371 (1940) (challenging a

Presidential Proclamation issued pursuant to Section 336(c) of the Tariff Act of 1930).  In

exercising his discretion to impose import restrictions, the President concurred with the Secretary's

findings that current import levels could impair the country's national security.  Where Congress,

as in this case, has authorized the President to take "legislative action that is necessary or

appropriate . . . the judgment of the [President] as to existence of facts calling for that action is not

subject to review."  Id. at 380 (citations omitted); see also Am. Inst. for Int'l Steel, Inc. v. United

States, 43 CIT __, __, 376 F. Supp. 3d. 1335, 1341–43 (2019), aff'd, 806 Fed. App'x 982 (Fed

Cir. 2020), cert. denied, 141 S. Ct. 133 (2020) (reviewing cases involving unreviewability of

discretionary Presidential actions).  Because Plaintiffs' claim that the President failed to identify

an "impending threat" is not reviewable, the Government is entitled to judgment on the pleadings

as to Count Three of the Complaint.[14]

---

[14] Even if reviewable, Plaintiffs' textual argument also fails.  First, Plaintiffs focus mostly on the
word "impending," which is not found anywhere in the statute, but rather comes from the
Plaintiffs-provided definition of "threat."  Moreover, the word "threat" does not appear in this
provision of the statute, either.  The word used in the statute is the transitive verb "threaten," which,
as the Government notes, has a different set of definitions than "threat."  Def.'s Corr. Reply at 17.
These definitions include: "to utter threats against," "to give signs or warning of," "to hang over
dangerously," "to announce as intended or possible," and "to cause to feel insecure or anxious."
Threaten, Merriam-Webster Online Dictionary, https://www.merriam-
webster.com/dictionary/threaten (last visited Jan. 27, 2021).  Plaintiffs chose not to consider any
of these definitions and instead rely solely upon Merriam-Webster's third-provided definition of
"threat," which is "an indication of something impending."  The court disagrees that the plain text
of the statute supports Plaintiffs' preferred reading.

As noted, Plaintiffs make much of the word "impending," suggesting that the
circumstances hypothesized about the inability of the United States to defend itself due to levels
of steel imports if it were to enter a war is nothing more than a "fanciful scenario," and not concrete
enough to justify action pursuant to Section 232.  Pls.' Br. at 35.  However, the Government is
correct in contending that the statute does not require identification of an "impending" threat, and
that "threaten to impair" and "impending threat" are not identical.  Def.'s Br. at 30.  Furthermore,
in this case, the President concurred with the Secretary's finding that a threat to impair already
existed, not that it was "on the distant horizon."  See Def.'s Br. at 31; see also Proclamation 9705,
¶ 2 (The President noting that "steel articles are being imported into the United States in such
quantities . . . as to threaten to impair the national security of the United States," not that they may
be in the distant future.).  Section 232 is written in the present tense (" .  .  . an article is being
imported into the United States in such quantities," 19 U.S.C. § 1862(b)(3)(A) (emphasis added));
in determining the meaning of any act of Congress, words used in the present tense include the
future as well as the present.  See Carr v. United States, 560 U.S. 438, 448 (2010).  Furthermore,
Plaintiffs conceded at oral argument that the statute allows the President to act to address present
threats as well as future ones.  Oral Arg. at 11:43.  Thus, even if the statute did require an
impending threat, that condition was met by the President's finding here.

### III.    The Duration As Set Forth in <u>Proclamation 9705</u> Does Not Violate Section 232.[15]

Under Section 232, if the President concurs with a finding of the Secretary in his report that imports "threaten to impair national security," 19 U.S.C. § 1862(c)(1)(A)(i), the President "shall" "determine <u>the nature and duration of the action</u> that, <u>in the judgment of the President</u>, must be taken to adjust the imports . . . so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii) (emphasis added). Plaintiffs contend that the President violated the statute by not "setting a termination date <u>or by [not] specifying circumstances that would end the threat to impair national security</u>." Pls.' Br. at 38 (emphasis added).

In <u>Proclamation 9705</u>, the President "concur[s] in the Secretary's finding that steel articles are being imported into the United States in such quantities and circumstances as to threaten to impair the national security of the United States." <u>Proclamation 9705</u>, ¶ 5. He states that in his "judgment" a twenty-five percent tariff on steel articles imported from all countries except Canada and Mexico is "[u]nder current circumstances . . . necessary and appropriate to address the threat that imports of steel articles pose to the national security." <u>Id.</u> ¶ 8.[16] <u>Proclamation 9705</u> states that

---

[15] This section corresponds to Count Two, Paragraph 66, of Plaintiffs' amended complaint. Am. Compl. ¶ 66.

[16] The President states that the tariff is

> necessary and appropriate in light of the many factors I have considered, including the Secretary's report, updated import and production numbers for 2017, the failure of countries to agree on measures to reduce global excess capacity, the continued high level of imports since the beginning of the year, and special circumstances that exist with respect to Canada and Mexico. This relief will help our domestic steel industry to revive idled facilities, open closed mills, preserve necessary skills by hiring new steel works, and maintain or increase production, which will reduce our Nation's need to rely on foreign producers for steel and ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense.

<u>Proclamation 9705</u>, ¶ 8.

the twenty-five percent tariff rate on most steel imports would be effective from "March 23, 2018, and shall continue in effect, unless such actions are expressly reduced, modified, or terminated." Id. at cl. 5(a).   The Government contends that the President satisfied this requirement in Proclamation 9705 by stating that the twenty-five percent tariff rate on most steel imports would remain in effect from March 23, 2018 "until and unless such actions are expressly reduced, modified, or terminated." Def.'s Br. at 26 (quoting Proclamation 9705, 83 Fed. Reg. 11,628, cl. 5(a)). The Government believes that stating that the tariffs will remain in effect until the President says otherwise is a sufficient way for the President to "determine the . . . duration" of the action.

In ascertaining the meaning of "duration" in Section 232, we are informed by fundamental principles of statutory construction: we look to the plain meaning of the statute, legislative history as may be necessary to provide context, and caselaw.   See Cook v. Wilkie, 908 F.3d 813, 817 (Fed. Cir. 2018)  ("Accordingly, we will ascertain the best meaning of § 7107(b) 'by employing the traditional tools of statutory construction; we examine the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'") (quoting Delverde, SrL v. United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000)); see generally Robert Katzmann, Judging Statutes (2014).  We conclude that more finite terms than the Proclamation provides in this case are not necessary.

The plain meaning of the word "duration" is straightforward.  Duration is defined as "(1) [t]he length of time something lasts, [and] (2) [a] length of time or continuance in time." Duration, Black's Law Dictionary (11th ed. 2019); see also  Duration, Ballentine's Law Dictionary (3d ed. 2010) ("The period of existence, . . . continuance in time; the portion of time during which anything exists.").  The word "determine" is equally clear, meaning "[t]o terminate; to cease; to end[, t]o put an end to controversy by deciding the issue or issues." Determine, Ballentine's Law Dictionary

(3d   ed.   2010);   <u>see   also</u>   <u>Determine</u>,   <u>Oxford   English   Dictionary</u>, https://www.oed.com/view/Entry/51244?redirectedFrom=determine#eid (last visited Feb. 2, 2021) ("[t]o put an end or limit to; to come to an end.").  In light of these definitions, when the President is required to "determine the . . . duration" of the action, he must state and decide at that time the action's continuance in time, or the time for which the action will last.  There are multiple ways that the President could feasibly do so, especially because the statute explicitly states that he shall make the determination "in his judgment."  19 U.S.C. § 1862(c)(1)(A)(ii).  For example, he could identify a date by which he believes the action will no longer be necessary, or he could identify criteria or conditions which, if met, would end the action's continuance.  Either of these options is consistent with the plain meaning of the word "duration" and allows the President a great deal of flexibility, as he may determine the duration based solely on his judgment.

Here, the President did specify the "duration" of his selected measures.  <u>Proclamation 9705</u> specifies when the duties would first be collected -- the President ordered that the twenty-five percent tariff rate on most steel article imports would begin on March 23, 2018.  The Proclamation then states it would remain in effect until and "unless such actions are expressly reduced, modified or terminated," 83 Fed. Reg. at 11628, cl. 5(a), with further instruction to the Secretary to "inform the President of any circumstance that in the Secretary's opinion might indicate that the increase in duty rate provided for in this proclamation is no longer necessary."  <u>Id.</u> at cl. 5(b).  In our view, the President thus explained that the measures he was placing on steel article imports would continue until the problems he had identified were alleviated.  That is the "duration" the President believed, in [his] "judgment," addressed the national security concerns that he had specified. Accordingly, the President's pronouncement falls within the plain reading of the statute.

Plaintiffs contend that the President must "state a finite duration" of his action at the outset because the word "duration" "communicates Congress' intention that if subsequent events require a reassessment of the measures needed to end the threat to impair the national security, further investigation and fact-finding would be necessary." Pls.' Br. at 38–40. The Government counters that interpreting the word "duration" in the way Plaintiffs suggest "would not only constrict the President's authority to make ongoing national assessments, but it would allow foreign governments and producers to evade the President's predetermined limits by simply waiting out the measures, undermining the central purpose of Section 232 assessments." Def.'s Corr. Reply at 18–19. We need not wade into the differing policy perspectives evidenced by these two dueling views: what cannot be disputed is that if Congress wanted to require that the President proclaim a fixed temporal limit to the measures selected, it could have done so. It did not; and it is not the role of the court to direct otherwise. As to Plaintiffs' concern that the measures imposed could persist indefinitely, the court notes that there is a distinction between the indefinite and the undefined. Here, as noted, even if the duration may be unlimited, it is not undefined, but bounded by whether, in the President's judgment, the threat to impair national security exists.

Noting that in 1988 Congress revised Section 232, Plaintiffs urge that those amendments support their interpretation of the word "duration." Prior to the 1988 amendments, Section 232 provided in relevant part:

> If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security he shall so advise the President and the President shall take such action, and for such time, as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security . . . .

19 U.S.C. 1862(b) (1980) (emphasis added).

The 1988 amendments changed "the President <u>shall take such action and for such time</u>, as he deems necessary" to the President shall "<u>determine the nature and duration of the action</u> that, in the judgment of the President, must be taken . . . ." 19 U.S.C. § 1862(c)(1)(A)(ii) (emphasis added); <u>see also</u> H. Rep. No. 100-578 at 161 (1988). Plaintiffs contend that Congress added the word "duration" for "a reason," namely to remove the "option to declare import restrictions for an indefinite period." Pls.' Br. at 37. We are not persuaded. If the 1988 amendments removed such Presidential authority, we would expect that Congress would have made such a change explicitly. "Here, the applicable principle is that Congress does not enact substantive changes <u>sub silentio</u>." <u>United States v. O'Brien</u>, 560 U.S. 218, 231 (2010) (citing <u>Dir. of Revenue of Mo. v. CoBank ACB</u>, 531 U.S. 316, 323 (2001)). There is no evidence in the legislative history that the word "duration" was meant to connote an exact time period. Contemporaneous reports summarizing the 1988 amendments provide no evidence that Congress intended to require that the President proclaim the duration of the measures with more specificity than he did in <u>Proclamation 9705</u>. <u>See</u> H. Rep. No. 100-576 at 709–13; S. Rep. No. 100-71 at 21, 135–36 (summarizing the amendments to Section 232). The absence of legislative history regarding "duration" can be contrasted with the abundant legislative history relating to the other Section 232 amendments, which evinced Congressional concern with Presidential delay in taking Section 232 action.[17] We conclude that

---

[17] The history of the 1988 amendments reveals that the amendments were motivated in no small part by a desire to accelerate Presidential action pursuant to Section 232. Congress had been frustrated by perceived undue Presidential delay in taking timely or effective action pursuant to the Secretary's report that machine tools threatened to impair the national security. At the amendment hearings, Speaker of the House James Wright commented that "many of our trade problems can be directly traced back to the delays by those officially appointed to carry out American policy" and pointed to the "machine tools case" as an example. Hearings Before the Committee on Ways and Means on H.R. 3 Trade and International Economic Policy Other Proposals Reform Act, 100th Cong. (1987). The resulting amendments to Section 232 added various timing provisions to the statute, requiring the President to act within certain timeframes as

the change from "for such time" to "the . . . duration" was stylistic and not substantive.  Therefore, we will grant the Government's motion for judgment on the pleadings as to Count Two, paragraph 66, of the amended complaint.

### IV.      *Mandatory Timing Conditions and Tariffs Imposed Upon the EU, Canada, and Mexico*[18]

Finally, alleging that the President violated certain mandatory timing parameters of Section 232, Am. Compl. ¶ 70, Plaintiffs challenge Proclamation 9759, which modified previous Proclamations to impose tariffs on imports from Canada, Mexico, and the European Union, and imposed quotas on Brazil and Argentina based on agreements with those countries.  Am. Compl. ¶ 49.  Plaintiffs make the following allegations: (1) Section 232 precluded the President from letting the temporary exemption on tariffs for imports from Canada, Mexico, and the EU expire "earlier than 180 days after the announcement of the President's decision"; and (2) the President violated Section 232 by extending the exemptions for one month after the fifteen-day period that the President had to act, after he concurred with the Secretary's findings, but before the 180-day negotiation period had expired.

Plaintiffs have misinterpreted Section 232 in contending that subsection (c)(3)(A) requires the President to wait 180 days before determining that efforts at negotiation have been unsuccessful and choosing an alternative method of action.  The relevant portion of the statute provides:

---

a way to prevent "languishing negotiations" and undue delay.  See Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, Title I, § 1501, 102 Stat. 1107, 1257–60.

[18] This section corresponds to Count Four of Plaintiffs' amended complaint, except for paragraph 71 for which consideration was stayed.  Am. Compl. ¶¶ 69–71.

>    If—
>
>    (i) the action taken by the President . . . is the negotiation of an agreement which
>    limits or restricts [] import[s] . . . to, the United States of the article that threatens
>    to impair national security, and . . .
>    (I) no such agreement is entered into before the date that is 180 days after the date
>    on which the President makes the determination under paragraph (1)(A) to take
>    such action . . .
>    the President shall take such other actions as the President deems necessary to
>    adjust the imports of such article so that such imports will not threaten to impair
>    the national security.

19 U.S.C. § 1862(c)(3)(A).

Plaintiffs suggest that "the only rational construction of [19 U.S.C. § 1862(c)(3)(A)] requires the President to negotiate for the entire 180-day period." Pls.' Br. at 43. However, consideration of the plain meaning of the statute's text along with the legislative history of the 1988 amendments reveals that Plaintiffs are incorrect that this provision sets 180 days as a minimum amount of time that the President must wait before taking alternative action, rather than the maximum amount of time that he can wait. First, it is likely that Congress would have chosen language that more clearly required the President to negotiate for 180 days before choosing alternate action if that were Congress's intention. For example, the statute might have stated, "If no agreement has been reached once 180 days have passed, the President may then consider taking other such actions . . . " or, perhaps, used even more explicit language such as: "The President must wait 180 days before choosing an alternative form of action." By contrast, the language used, read plainly, does not suggest that waiting 180 days before modifying the action is a requirement. See 19 U.S.C. § 1862(c)(A)(3). Furthermore, the 1988 amendments to Section 232 were motivated by a desire to prevent Presidential inaction and inefficiency under Section 232.[19]  When viewed in

---

[19] See Sect. III, supra, for discussion of the legislative history of the 1988 amendments.

this context, it would be contrary to Congressional intent and the overarching goal of the 1988 amendments to require the President to wait 180 days before acting if he found that attempts at negotiations were ineffective.  Therefore, Plaintiffs' argument on this aspect of the claim fails.

The remainder of Plaintiffs' argument on this claim also turns upon their understanding of the 180-day provision as a minimum, not maximum, timing requirement.  Plaintiffs argue that entering into negotiations pursuant to subsection (c)(3)(A) is the exclusive means of deferring action past the fifteen-day period after concurring with the Secretary's finding.  Pls.' Br. at 43 (". . . without meeting the terms of the (c)(3)(A) exception, there are no exceptions to the 90-day and 15-day deadlines.").  Plaintiffs argue that, therefore, Proclamation 9711, which exempted the EU and other countries from the twenty-five percent tariff, and Proclamation 9740, which extended the exemption on Canada, Mexico, and the EU for one month until June 1, 2018, were impermissible attempts to bypass the statutory time limits of Section 232.  Id.; Proclamation 9711; Proclamation 9740.  However, Plaintiffs' claims fail because, in fact, the President declared that he planned to negotiate with Mexico, Canada, and the EU within fifteen days of concurring with the Secretary's finding.  See Proclamation 9705; Proclamation 9711.  Proclamation 9705, in which the President concurred with the Secretary's finding and established a twenty-five percent tariff on steel imports from most countries, was issued on March 8, 2018.  See Proclamation 9705, ¶¶ 8–11.  Proclamation 9705 excluded Canada and Mexico from these tariffs, stating that instead the United States would attempt to negotiate with those countries.  Id.  Fourteen days later, on March 22, 2018, the President issued Proclamation 9711, which announced that the United States would attempt negotiations[20] with a number of other nations, including the EU, and thus that those

---

[20] Plaintiffs suggest that the President also failed to announce the intention to negotiate an agreement with the member nations of the European Union, but just announced "continuing

countries would be temporarily exempted from the steel tariff along with Canada and Mexico.  See Proclamation 9711, ¶¶ 6–9.  This action was taken within fifteen days of the President concurring with the Secretary's finding, and thus complied with the statutory requirements of 19 U.S.C. § 1862(c)(1)(B) ("the President shall implement that action no later than the date that is 15 days after the day on which the President determines to take action under subparagraph (A)").  Given that the action that the President chose with respect to those countries was to attempt negotiations, the statute grants him the authority to modify that action if negotiations fail to be successful within 180 days.  19 U.S.C. § 1862(c)(3)(A)(ii)(I).  Because the tariffs that the President imposed upon Mexico, Canada, and the EU took effect on June 1, 2018, which was well within 180 days of March 8, 2018, these measures were not in violation of the statute.  Hence, Count Four, insofar as it relies on the alleged failure to comply with Section 232's timing provision, is not meritorious.

---

discussions" with these countries to discuss "satisfactory alternative means" to address the threatened impairment to national security.  Pls.' Br. at 45.  This argument does not hold water because "continuing discussions to discuss satisfactory alternative means" is in essence the definition of negotiation.  Merriam-Webster's online dictionary defines "negotiate" as "to confer with another so as to arrive at the settlement of some matter."  Negotiate, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/negotiate (last visited Jan. 27, 2021).

## CONCLUSION

For the foregoing reasons, upon consideration of Plaintiffs' challenges to <u>Proclamation 9705</u> and its subsequent modifications, we conclude that the Government is entitled to judgment as a matter of law.  Therefore, we grant the Government's motion for judgment on the pleadings and deny Plaintiffs' cross-motion for partial summary judgment.[21]  Accordingly, it is hereby

**ORDERED** that Defendants' motion for judgment on the pleadings is granted; and it is further

**ORDERED** that Plaintiffs' cross-motion for partial summary judgment is denied.

*/s/  Gary S. Katzmann*
Gary S. Katzmann, Judge

*/s/  M. Miller Baker*
M. Miller Baker, Judge

*/s/  Leo M. Gordon*
Leo M. Gordon, Judge

Dated: <u>February 4, 2021     </u>
      New York, New York

---

[21] Count Four, paragraph 71, will continue to be stayed pursuant to the court's previous order.  <u>See</u> Scheduling Order, Mar. 10, 2020, ECF No. 26; Nt. 3, <u>supra</u>.

*Katzmann*, Judge, with whom *Gordon*, Judge joins, <u>concurring</u>:  Even in the early days of the Republic, the question of the connection between international trade and national defense was very much part of the public discourse.  Two days after Congress first achieved a quorum, on April 8, 1789, James Madison introduced a bill to levy duties on imports, with the goal of generating revenue for the new nation.[1]  Stating that he was a "friend to the very free system of commerce," he admitted to three exceptions:  revenue, navigation for foreign vessels whose home countries discriminated against American vessels, and national defense.[2]  With respect to the national defense exception, though skeptical of its long-term applicability as the new nation grew stronger, Madison agreed with the principle that "each nation should have within itself, the means of defense independent of foreign supplies."[3]  In January 1790, President Washington observed that the safety and interest of a free people "require that they should promote such manufactories as tend to render them independent of others for essential, particularly military supplies."[4]  On January 15, 1790, the House of Representatives directed that the Secretary of the Treasury "appl[y] his attention . . . to the subject of Manufactures, and particularly to the means of promoting such as will tend to render the United States independent on foreign nations for military and other essential supplies[.]"[5]  In response, on December 5, 1791, Alexander Hamilton submitted the landmark <u>Report on Manufactures</u>.  Therein he wrote:

---

[1] Douglas A. Irwin, <u>Clashing Over Commerce: A History of US Trade Policy</u> 73 (2017).

[2] <u>Id.</u> at 74–75 (quoting 12 <u>Papers of James Madison, Congressional Series</u> 70–71 (William T. Hutchinson and William M.E. Rachel eds., 1979)).

[3] <u>Id.</u> at 75 (quoting 12 <u>Papers of James Madison</u>, <u>supra</u>, at 71–72).

[4] <u>Id.</u> at 80.

[5] Alexander Hamilton, <u>Report on Manufactures: Made to Congress December 5, 1791, In His Capacity as Secretary of the Treasury</u> 5 (Home Market Club, 1892).

> Not only the wealth, but the independence and security of a country, appear to be materially connected with the prosperity of manufactures. Every nation, with a view to these great objects, ought to endeavor to possess within itself all the essentials of national supply. These compromise the means of subsistence, habitation, clothing and defence.[6]

Hamilton noted that "[t]he want of a navy, to protect our external commerce, as long as it shall continue, must render it a peculiarly precarious reliance for the supply of essential articles, and must serve to strengthen prodigiously the arguments in favor of manufactures."[7] Concluding that "[t]he manufactures of [iron] are entitled to pre-eminent rank[,]" "[t]he only further encouragement of manufactories of this article, the propriety of which may be considered as unquestionable, seems to be an increase of the duties on foreign rival commodities."[8]

---

[6] Id. at 45–46.

[7] Id. at 46.

[8] Id. at 63, 64.

Since the 1940's, national defense has been imagined more broadly and robustly as "national security."[9]   Today, international trade and national security are inextricably linked.[10] That truth, of course, is evidenced by the statute before us -- Section 232 -- which authorizes the President to make adjustments on imports, including the tariffs at issue here, upon a determination that they threaten to impair national security.  Section 232 was born during the Cold War.[11]  In its first decades, on the few occasions when it was invoked by a President, it was for the most part to deal with the energy crisis facing America and to address the dangers to American self-sufficiency

---

[9] See Andrew Preston, Monsters Everywhere:  A Genealogy of National Security, 38 Diplomatic Hist. 477 (2014).  According to one historian, the term "national security," already rare, between World War I and 1931, was "uttered only four times, by two presidents, and mostly as rhetorical flourish."  Id. at 487.  It was President Franklin Roosevelt, in his December 29, 1940 Fireside Chat specifically on national security, who "linking the Depression's economic insecurity with the geopolitical insecurity spurred by World War II, announced the need for domestic mobilization, and reiterated his support for Great Britain."  Dexter Fergie, Geopolitics Turned Inwards: The Princeton Military Studies Group and the National Security Imagination, 43 Diplomatic Hist. 640, 649 (2019).  President Roosevelt told the nation:

> This is not a fireside chat on war.  It is a talk on national security . . . .  [N]o nation can appease the Nazis . . . .  [A] dictated peace would be no peace at all.  It would be only another armistice, leading to the most gigantic armament race the most devastating trade wars in all history . . . .  We must be the great arsenal of democracy.  For us this is an emergency as serious as war itself . . . .  I have the profound conviction that the American people are now determined to put forth a mightier effort than they have every yet made . . . to meet the threat to our democratic faith.

Fireside Chat, December 29, 1940, The Public Papers and Addresses of Franklin D. Roosevelt, 1940 Volume, 633, 638–39, 643–44 (1941).  Two years after the end of World War II, the term "national security" was given institutional infrastructure when President Truman signed the National Security Act of 1947, ch. 343, 61 Stat. 495 (1947).

[10] See generally Kathleen Claussen, Trade's Security Exceptionalism, 72 Stan. L. Rev. 1097 (2020).

[11] Cong. Rsch. Serv., R45279, Section 232 Investigations: Overview and Issues for Congress 2 (2020), https://crsreports.congress.gov/product/pdf/R/R45249/26.

flowing from dependence on foreign oil.[12]  In 2018, after some thirty-two years of dormancy,[13] Section 232 was invoked by the President, concurring with the recommendation of the Secretary of Commerce, to apply tariffs on certain imports of steel and aluminum upon the Secretary's determination that the quantities and circumstances of the imports threatened to impair the national security.  The revival of Section 232, as reflected in the various Proclamations noted in this opinion, and in the adjudication before the courts, has occasioned argument and commentary focusing on conceptions of Presidential and Congressional power.

In this case, we have been tasked, inter alia, with the interpretation of "duration" in Section 232.  We have concluded that Proclamation 9705, though indefinite temporally, is defined and thus provides the "duration" required by the statute in that the higher tariffs remain in effect until the President determines that the threat to national security caused by steel imports no longer exists.  What of the potential for abuse, namely that the tariffs may be continued in effect even when the conditions underlying their imposition -- a threat to national security posed by importation -- no longer exists?  That concern, which in theory, may be a valid one, has not been squarely presented to us nor is there a claim in fact of overreaching by the President.  Because no such claim of abuse has been asserted, it is not before the court.  Nor do we consider whether it would be subject to our review.  Nevertheless, there are certain observations that can be made.

The Supreme Court has stated that "[n]ational-security policy is the prerogative of the Congress and President."  Ziglar v. Abbasi, 137 S. Ct. 1843, 1861 (2017) (citing U.S. Const. art. I, § 8, art. II, § 1, § 2).  See generally David Barron, Waging War: The Clash Between Presidents

---

[12] Id. at 4.  Prior to 2018, presidents took action six times under Section 232 after determinations by Commerce that certain imports threatened to impair national security.  Id.

[13] Prior to 2018, a president last imposed tariffs or other trade restrictions under Section 232 in 1986, based on a 1983 probe into imports of machine tools.  Id.

and Congress, 1976 to ISIS (2016).  "Judicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'" Ziglar, 137 S. Ct. at 1861 (quoting Christopher v. Harbury, 536 U.S. 403, 417 (2002)).  While, as noted below, the Presidential authority over international trade is largely statutory, the President does possess some independent constitutional authority over national security and dealings with foreign nations.  See, e.g., id. (national security); Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 415 (2003) (executive agreements).  "Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations." Am. Ins. Ass'n, 539 U.S. at 414 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610–11 (1952) (Frankfurter, J. concurring)).  "[C]ourts have shown deference to what the Executive Branch 'has determined . . . is essential to national security.'" Ziglar, 137 S. Ct. at 1861 (alteration in original) (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24, 26 (2008)).  "[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." Dep't of Navy v. Egan, 484 U.S. 518, 530 (1988) (citations omitted). Flexibility can be allowed the President in the conduct of foreign affairs, see United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 324–27 (1936), although that power is not unbounded, even in times of crisis.  See Hamdi v. Rumsfeld, 542 U.S. 507, 535–36 (2004) ("[W]e necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances. . . . Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when

individual liberties are at stake.") (citing Mistretta v. United States, 488 U.S. 361, 380 (1989); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 426 (1934)). See generally Harold Koh, The National Security Constitution: Sharing Power after the Iran-Contra Affair (1990). Ultimately, however, this case does not present the question of the review of the exercise of constitutional power that may be lodged in the Executive.

Trade statutes occupy a distinct place in the constellation of legislation. Under the Constitution, the power over trade is lodged solely in the Congress. Article I, Section 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I § 1. Section 232 was enacted pursuant to the power granted exclusively to Congress by Article I, Section 8 of the Constitution, which provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises," as well as "To regulate Commerce with foreign Nations." U.S. Const. art. I § 8. There is no provision in the Constitution that vests in the President the same "Power To Lay and collect . . . Duties." As one commentator has observed, "[t]he president has no similar grant of substantive authority over economic policy, international or domestic. Consequently, international trade policy differs substantially from other foreign affairs issues, such as war powers, where the president shares constitutional authority with Congress. Where international trade policy is concerned, the president's authority is almost entirely statutory."[14] In 1976, in the seminal case, the Supreme Court held that the President's leeway under Section 232 was "far from unbounded," and that the statute was a constitutionally permissible delegation of legislative power to the President, stating

---

[14] Timothy Meyer, Trade, Redistribution, and the Imperial Presidency, 44 Yale J. Int'l L. Online 21 (2018), https://cpb-us-w2.wpmucdn.com/campuspress.yale.edu/dist/8/1581/files/2019/02/3_Meyer_YJIL-Symposium_Redistribution-and-Imperial-Presidency_12.04.18-1zj65ya.pdf (footnotes omitted); see also Timothy Meyer & Ganesh Sitaraman, Trade and the Separation of Powers, 107 Cal. L. Rev. 583 (2019).

that Section 232(b) "establishes clear preconditions to Presidential action" in that Section 232(c) "articulates a series of specific factors to be considered by the President in exercising his authority under [Section 232(b)]." Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559 (1976). See generally Am. Inst. for Int'l Steel, Inc. v. United States, 43 CIT __, __, 376 F. Supp. 3d, 1335, 1346–53 (2019) (Katzmann, J., dubitante) (reviewing cases involving challenges to trade legislation raising the question of unconstitutional delegation of legislative power); Transpacific Steel LLC v. United States, 43 CIT __, __, 415 F. Supp. 3d 1267, 1277–78 (2019) ("Transpacific Steel I") (Katzmann, J., concurrence).  Forty-three years later -- in a case where the President, invoking Section 232, imposed by proclamation a twenty-five percent tariff on certain imported steel products -- this court bound by Algonquin, rejected a challenge to Section 232 based on the claim that it was an unconstitutional delegation of legislative power in violation of the separation of powers. Am. Inst. for Int'l Steel, 376 F. Supp. 3d 1335, aff'd, 806 Fed. App'x 982 (Fed. Cir. 2020) (citing Algonquin as controlling precedent), cert. denied, 141 S. Ct. 133 (2020).  More recently, construing the statutory requirements under the scheme set forth in Section 232, the court determined that Proclamation 9772 was unlawful and void because it was issued without following statutory procedures mandated by Section 232, including that the President acted outside the temporal investigative and consultative limits required by Section 232, and singled out imports of Turkish steel products in violation of the Equal Protection guarantees of the Fifth Amendment. Transpacific Steel LLC v. United States, 44 CIT __, __, 466 F. Supp. 3d 1246, 1260 (2020).  See also Transpacific Steel I, 415 F. Supp. 3d at 1275–76  ("The procedural safeguards in section 232 [including temporal deadlines for Presidential actions] do not merely roadmap action; they are constraints on power" which, per Algonquin, 426 U.S at 559, enable Section 232 to "avoid[]

running afoul of the non-delegation doctrine because it establishes 'clear preconditions to Presidential action.'").

In sum, in this case we construe a domestic statute pertaining to international trade, a domain in which -- unlike other foreign affairs issues, such as war powers, where the President shares constitutional authority with Congress -- Congress has exclusive constitutional authority. Congress has delegated power under Section 232 to the Executive.  If nothing else, precedent affirms that in enacting such statutes, Congress can restrict the actions of the President in the delegation of its power of trade to the Executive; indeed, the constitutionality of that legislation is informed by restraints on that power.  We have concluded that the duration as indicated in Proclamation 9705 -- defined by the end of the threat to national security but indefinite in temporal span -- comports with the statute.  It can be noted that with respect to Section 232 as currently written, that conclusion does not render meaningless the system of checks and balances -- a system of differentiated institutions sharing power which undergirds our government.  "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government.  It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." Youngstown Sheet & Tube, 343 U.S. at 635 (Jackson, J., concurring); see also Mistretta, 488 U.S. at 381 (quoting the same).  There have been proposals put forward suggesting greater Congressional oversight, including hearings, or statutory amendments which would expand Congress's role in the implementation and review of tariffs.[15]  Ultimately, of course, these are policy matters that fall within the province of the legislative branch; it is not the role of the court to opine about them.  See Silfab Solar, Inc. v.

---

[15] Cong. Rsch. Serv., R45529, Trump Administration Tariff Actions: Frequently Asked Questions 36–38 (2019), https://crsreports.congress.gov/product/pdf/R/R45529/2.

Court No 19-00209            Katzmann, J. and Gordon, J., Concurrence              Page 37

United States, 892 F.3d 1340, 1349 (Fed. Cir. 2018) ("If Congress desires to eliminate these tariffs

or to cabin the President's authority, that is a matter for Congress to address in future legislation,

not a matter for this court on this appeal").  We do not do so now.


                                        /s/   Gary S. Katzmann
                                        Gary S. Katzmann, Judge


                                        /s/   Leo M. Gordon
                                        Leo M. Gordon, Judge

*Baker*, Judge, concurring in part and dissenting in part:

I join the *per curiam* opinion except as to footnotes 6 and 14 and Section III. I write separately to explain my view that (1) we have no jurisdiction to review the duration of Section 232 action set by the President and (2) we should dismiss the President from the case.

## I.

Plaintiffs allege that the President violated Section 232 by failing "to specify the duration of" Proclamation 9705 and its subsequent modifications. Amended Complaint Count Two, ECF 11, at 16 ¶ 66. In their briefing, Plaintiffs elaborate on this claim, contending that the President acted unlawfully in failing to "set[] a termination date or . . . *specify[] circumstances that would end the threat to impair national security*." ECF 35, at 45 (emphasis added).

The *per curiam* opinion rejects this claim on the merits. *Ante* at 19–24. I would reject it for lack of jurisdiction and not reach the merits.

Here, Plaintiffs' briefing makes clear that their objection is not that the President failed to set a duration for the challenged import restrictions. After all, he *did* set a duration. Proclamation 9705 states that liability for duties on designated imports commenced on March 23, 2018, "and shall continue in effect, unless such [duties] are expressly reduced, modified, or terminated" by the President. Proclamation 9705 of March 8, 2018, *Adjusting Imports of Steel into the United States*, 83 Fed. Reg. 11,625, 11,627–28 (Mar. 15, 2018).[1]

---

[1] The ensuing modifications to Proclamation 9705 used the same formulation for setting the applicable end date.

Plaintiffs instead object to the President's choice of the condition or contingency that terminates those restrictions—his discretionary determination that such restrictions are no longer necessary. In effect, Plaintiffs contend that the President acted arbitrarily by reserving to himself the discretion to determine when to end import restrictions imposed by Proclamation 9705 and its modifications.

The problem with Plaintiffs' argument is that nonstatutory review of Presidential action for violation of a statute is "only rarely available." *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018). Among other things, such review "is not available when the statute in question commits the decision to the discretion of the President." *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1360 (Fed. Cir. 2006) (en banc) (cleaned up) (quoting *Dalton v. Specter*, 511 U.S. 462, 474 (1994)).

Section 232 leaves the determination of the "duration" of action to the President's "judgment." 19 U.S.C. § 1862(c)(1)(A)(ii). To say—as Plaintiffs in effect say here—that the President acted arbitrarily in setting the duration of import restrictions is to say that he abused his discretion, and "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [federal court] review." *Dalton*, 511 U.S. at 476; *see also Motion Sys.*, 437 F.3d at 1361 (stating that the Supreme Court in *Dalton* and earlier decisions "insulated Presidential action from judicial review for abuse of discretion despite the presence of some statutory restrictions on the President's discretion"). We have no authority to review the President's discretionary choice among conditions or contingencies that might terminate import restrictions.

## II.

I have previously explained at length my view that our Court lacks subject matter jurisdiction to enter relief against the President, and that we should dismiss him as a party when he is named as a defendant in our Court. *See PrimeSource Bldg. Prods., Inc. v. United States*, Ct. No. 20-00032, Slip Op. 21-8, at 64–74 (CIT Jan. 27, 2021) (Baker, J., concurring in part and dissenting in part). Although today we deny any relief against Defendants—including the President—by dismissing all but the stayed claim, *see ante* at 28, the President remains in the case as to that claim. I therefore respectfully dissent from our failure to *sua sponte* raise the jurisdictional question and dismiss the President from what is left of this case.[2]

/s/ *M. Miller Baker*
M. Miller Baker, Judge

---

[2] In footnote 6 of the *per curiam* opinion, my colleagues respond to my dissent on this jurisdictional point. *See ante* at 9 n.6. I would counter that Plaintiffs in this case *do* seek injunctive relief against the President. *See* Amended Complaint, ECF 11, at 17 (requesting as relief—without any disclaimer as to the President—"[a] permanent injunction against the enforcement of any quota or levying of any tariff imposed pursuant to the Report and the Proclamations"); *see also* Proposed Order, Plaintiffs' Cross-Motion for Summary Judgment, ECF 56, at 2 (ordering without qualification "that Defendants are hereby enjoined from assessing or collecting duties from any Plaintiff pursuant to the purported authority of the Proclamations"). In addition, I acknowledge we have jurisdiction to enter the requested relief as to the *other* defendants, but the question I raise is whether we have jurisdiction to grant *any* relief against the President. If we don't, then we should dismiss him from the case. Beyond that, my reply to my colleagues in *PrimeSource* applies with equal force here. *See PrimeSource*, Slip Op. 21-8, at 64 n.9 (Baker, J., concurring in part and dissenting in part).