# United States Court of Appeals for the Federal Circuit

———————————

**USP HOLDINGS, INC., SUBSTITUTED FOR UNIVERSAL STEEL PRODUCTS, INC., PSK STEEL CORPORATION, DAYTON PARTS, LLC, BORUSAN MANNESMANN PIPE U.S. INC., JORDAN INTERNATIONAL COMPANY,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, GINA M. RAIMONDO, SECRETARY OF COMMERCE, TROY MILLER, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellees*

———————————

2021-1726

———————————

Appeal from the United States Court of International Trade in No. 1:19-cv-00209-GSK-MMB-LMG, Senior Judge Leo M. Gordon, Judge Gary S. Katzmann, Judge M. Miller Baker.

———————————

Decided: June 9, 2022

———————————

LEWIS LEIBOWITZ, The Law Office of Lewis E. Leibowitz, Washington, DC, argued for plaintiffs-

USP HOLDINGS, INC. v. US

appellants.

MEEN GEU OH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellees. Also represented by BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY, ANN MOTTO.

_____

Before DYK, MAYER, and CHEN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK, in which *Circuit Judge* MAYER joins, and in which *Circuit Judge* CHEN joins except as to footnote 4.

Additional views filed by *Circuit Judge* CHEN.

DYK, *Circuit Judge.*

The Trade Expansion Act of 1962 authorizes the President to adjust imports—if he concurs with a determination by the U.S. Secretary of Commerce ("Secretary") "that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security"—and to "determine the nature and duration" of the corrective action. 19 U.S.C. § 1862(c)(1)(A).

Based on an investigation under § 1862, the Secretary here determined that excessive steel imports threatened to impair the national security. The President concurred and issued a series of proclamations beginning with Proclamation 9705 on March 8, 2018. With those proclamations, the President imposed a twenty-five percent tariff on steel imports from a number of countries.

Appellants challenged the actions of both the President and the Secretary in the Court of International Trade ("Trade Court"), contending that the President's and Secretary's finding of a threat to national security and the President's imposition of a tariff for an indefinite duration

conflicted with the statute.  The Trade Court granted the government's motion for judgment on the pleadings.  We affirm.

BACKGROUND

I

Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, authorizes the President to adjust imports that threaten national security.  Section 1862 includes, as relevant here, three subsections.

Section 1862(b) directs the Secretary, on the request of an adversely affected party or an agency or department head, or on his own, to "immediately initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion." § 1862(b)(1)(A).  After the investigation is concluded, the Secretary must submit "a report on the findings of such investigation" to the President.  § 1862(b)(3)(A).  The report must include the Secretary's finding, if one is made, that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security" and "the recommendations of the Secretary for action or inaction" regarding such a finding.  *Id.*

Section 1862(c) provides that, thereafter, the President must determine if he agrees with the Secretary's threat finding and, if so, what action is necessary:

[If] the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall—

(i) determine whether the President concurs with the finding of the Secretary, and

(ii) if the President concurs, determine the nature and duration of the action that, in the judgment of

the President, must be taken to adjust the imports
of the article and its derivatives so that such im-
ports will not threaten to impair the national secu-
rity.

§ 1862(c)(1)(A).

Section 1862(d)[1] provides nonexclusive factors for the
President and the Secretary to consider regarding the
threat to national security determination:

> For the purposes of this section, <u>the Secretary and
> the President shall, in the light of the requirements
> of national security and without excluding other
> relevant factors, give consideration to</u> domestic
> production needed for projected national defense
> requirements, the capacity of domestic industries
> to meet such requirements, existing and antici-
> pated availabilities of the human resources, prod-
> ucts, raw materials, and other supplies and
> services essential to the national defense, the re-
> quirements of growth of such industries and such
> supplies and services including the investment, ex-
> ploration, and development necessary to assure
> such growth, and the importation of goods in terms
> of their quantities, availabilities, character, and
> use as those affect such industries and the capacity
> of the United States to meet national security re-
> quirements. In the administration of this section,
> <u>the Secretary and the President shall further rec-
> ognize the close relation of the economic welfare of
> the Nation to our national security, and shall take
> into consideration</u> the impact of foreign competi-
> tion on the economic welfare of individual domestic

---

[1]  The statute includes two instances of subsection
(d), which is a typographical error. We refer to the first
instance of subsection (d).

industries; and any substantial unemployment, de-
crease in revenues of government, loss of skills or
investment, or other serious effects resulting from
the displacement of any domestic products by ex-
cessive imports shall be considered, <u>without ex-
cluding other factors</u>, in determining whether such
weakening of our internal economy may impair the
national security.

§ 1862(d) (emphasis added).

## II

On April 19, 2017, the Secretary initiated an investiga-
tion under § 1862 to determine the effects of steel imports
on national security.  *See* Publication of a Report on the
Effect of Imports of Steel on the National Security, 85 Fed.
Reg. 40,208 (July 6, 2020).  The Secretary provided his re-
port and recommendation to the President on January 11,
2018.  *See id*. at 40,202.  The report included the Secre-
tary's findings:

The Secretary has determined that the displace-
ment of domestic steel by excessive imports and the
consequent adverse impact of those quantities of
steel imports on the economic welfare of the domes-
tic steel industry, along with the circumstance of
global excess capacity in steel, are "weakening our
internal economy" and therefore <u>"threaten to im-
pair" the national security as defined in Section
232</u>.

*Id*. at 40,224 (emphasis added).  In view of these findings,
the Secretary made the following recommendation:

Due to the threat of steel imports to the national
security, as defined in Section 232, the Secretary
recommends that the President take immediate ac-
tion by adjusting the level of imports through quo-
tas or tariffs on steel imported into the United
States, as well as direct additional actions to keep

      the U.S. steel industry financially viable and able
to meet U.S. national security needs. The quota or
tariff imposed should be sufficient, after accounting
for any exclusions, to enable the U.S. steel produc-
ers to be able to operate at about an 80 percent or
better of the industry's capacity utilization rate
based on available capacity in 2017.

*Id*. at 40,225.

      The President concurred with the Secretary's threat
finding and decided to take action in response. He an-
nounced those actions in multiple presidential proclama-
tions between March 8, 2018, and May 19, 2019. The
President issued Proclamation 9705 on March 8, 2018, and
established a twenty-five percent tariff on imports of steel
articles from all countries, except Canada and Mexico, to
take effect March 23, 2018. Proclamation No. 9705, 83 Fed.
Reg. 11,626–27 (Mar. 15, 2018). Proclamation 9705 also
invited "[a]ny country with which [the United States] ha[s]
a security relationship . . . to discuss with the United
States alternative ways to address the threatened impair-
ment of the national security caused by imports from that
country." *Id*. at 11,626.

      From March 22, 2018, to May 19, 2019, the President
issued a series of additional proclamations excluding vari-
ous countries from the twenty-five percent tariff, again in-
cluding Canada and Mexico. *See* Proclamation No. 9711 of
March 22, 2018, 83 Fed. Reg. 13,361–62 (Mar. 28, 2018);
Proclamation No. 9740 of April 30, 2018, 83 Fed. Reg.
20,683–84 (May 7, 2018); Proclamation No. 9759 of May 31,
2018, 83 Fed. Reg. 25,857–58 (June 5, 2018); Proclamation
No. 9777 of August 29, 2018, 83 Fed. Reg. 45,025–26 (Sept.
4, 2018); Proclamation No. 9894 of May 19, 2019, 84 Fed.

Reg. 23,987 (May 23, 2019).  Many other countries remained subject to the tariff.[2]

Appellants USP Holdings, Inc., PSK Steel Corporation, Dayton Parts, LLC, Jordan International Company, and Borusan Mannesmann Pipe U.S. Inc. (collectively, "USP" or "Appellants") are all U.S. corporations primarily engaged in the import of steel products.  USP filed suit with the Trade Court seeking a determination that the President's and the Secretary's threat determinations violated § 1862, that the imposition of the tariff was therefore unlawful, and that the indefinite duration of the tariff also violated § 1862.  As to the threat determination, USP argued that the statute required a finding of an "impending threat," a finding neither the Secretary nor the President made.  J.A. 17.  As to the President's determination to impose a tariff indefinitely, USP challenged only the President's action because the Secretary did not make any finding or recommendation as to the duration.  USP argued that the statutory requirement that the President "determine the nature and <u>duration</u> of the action," § 1862(c)(1)(A)(ii) (emphasis added), required the President to set a termination or end date, which he failed to do.  Appellants alleged they had paid the steel tariffs the President imposed in various amounts ranging from $500,000 to nearly $35 million.

The government moved for judgment on the pleadings, which the Trade Court granted.  *See Universal Steel Prods., Inc. v. United States*, 495 F. Supp. 3d 1336 (Ct. Int'l Trade 2021).  The Trade Court held that Proclamation 9705 and

___

[2]  On August 10, 2018, the President issued Proclamation 9772 increasing the tariffs for steel from Turkey from twenty-five to fifty percent.  Proclamation No. 9772, 83 Fed. Reg. 40,429, ¶ 6 (Aug. 15, 2018).  That increase was the subject of *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021).

the subsequent proclamations imposing tariffs did not vio-
late § 1862. However, the court also held that the Secre-
tary's report was not a final, reviewable action under the
Administrative Procedure Act ("APA"). Judge Katzmann,
joined by Judge Gordon, concurred separately. Judge
Baker concurred in part and dissented in part, arguing
that the court should dismiss the President as a party be-
cause it did not have jurisdiction "to enter relief against the
President" directly. *Id.* at 1360–61. USP subsequently
filed an unopposed motion for entry of partial judgment un-
der Rule 54(b), which the Trade Court granted.

USP appeals. We have jurisdiction under 28 U.S.C.
§ 1295(a)(5).

DISCUSSION

On appeal, "[w]e review a judgment on the pleadings
from the Court of International Trade *de novo.*" *Forest
Lab'ys, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir.
2007).

I

We first address the determinations by the President
and the Secretary that steel imports threaten to impair the
national security. USP challenges both determinations.
We consider the reviewability of this determination as to
both the President and the Secretary.

Under the Constitution, Congress has exclusive au-
thority to regulate international commerce. U.S. Const.
art. I, § 8, cl. 3. However, Congress is permitted to delegate
that authority to the Executive under appropriate circum-
stances. *See, e.g.*, *A.L.A. Schechter Poultry Corp. v. United
States*, 295 U.S. 495, 529–30 (1935). The Supreme Court
has considered the specific delegation of authority to con-
trol imports in § 1862 and upheld the statute. *Fed. Energy
Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976).
Approving the delegation to the President, the Supreme
Court noted that § 1862 satisfies the "intelligible principle"

requirement because "[i]t establishes clear preconditions to Presidential action—*inter alia,* a finding by the Secretary . . . '[that imports] threaten to impair the national security.'" *Id.* (quoting § 1862(b)(3)(A)).

The Supreme Court has held that the "President's actions may [] be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). But USP does not assert a constitutional challenge here because "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review under the exception recognized in *Franklin.*" *Dalton v. Specter*, 511 U.S. 462, 473–74 (1994).

Nonetheless, claims that the President's actions violated the statutory authority delegated to him in § 1862 are reviewable. Such review is available to determine whether the President "clear[ly] misconstru[ed]" his statutory authority. *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003); *see Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (explaining that courts may consider whether "the President has violated an explicit statutory mandate").[3]

Although we conclude the President's actions beyond his statutory authority are reviewable, we must also consider the appropriateness of bringing suit against the

_____

[3]     But the scope of this review is limited. *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018) ("[T]here are limited circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available."); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) ("For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.").

President directly.  The Trade Court held that the President himself could be named as a defendant in the complaint because no relief was sought against him.  As noted in Judge Baker's concurrence at the Trade Court, the President cannot be sued directly to challenge his threat determination under the statute.  As we held in *Corus*, the jurisdictional statute here, 28 U.S.C. § 1581(i), "does not authorize proceedings directly against the President." *Corus*, 352 F.3d at 1359.  The Trade Court should have dismissed the President.  Nonetheless, we have jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential directives, such as the Secretary of Commerce and Customs.  *See Corus*, 352 F.3d at 1359–60.

USP also alleges that the Secretary's action violated the statute.  USP argues that the Secretary's threat finding constitutes a final agency action that is subject to review under the APA.  *See* 5 U.S.C. § 704.  The Trade Court held that the Secretary's report was not a final, reviewable action under the APA because the "imposition of tariffs, which is the action that gave rise to the legal consequences that Plaintiffs challenge, was an action taken by the President, and not by the Secretary," such that the report did not carry legal consequences itself.  J.A. 23.

The Trade Court's decision in this respect is incorrect.  We have held that "an agency recommendation is subject to judicial review" if it constitutes a final agency action, i.e., "if 'the action . . . mark[s] the consummation of the agency's decisionmaking process,' and 'the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Corus*, 352 F.3d at 1358 (quoting *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997)).  In reference to the first prong, the government does not appear to dispute that the Secretary's threat determination is the consummation of the agency's decisionmaking process.

As to the second (legal consequences) prong, we addressed in *Corus* a statute where "the President does not have complete discretion under the statute" and his authority to act under the statute only arose "if the Commission [made] 'an affirmative finding regarding serious injury.'" *Corus*, 352 F.3d at 1359 (quoting 19 U.S.C. § 2253(a)(1)(A)). Because the agency report with an affirmative finding of a serious injury was a predicate to the President's authority to act in that case, we concluded that there were sufficient legal consequences for a reviewable, final agency action. *Id*. That conclusion was driven in large part by the Supreme Court's decision in *Bennett*, where the Court held that an opinion by the Fish and Wildlife Service that had "powerful coercive effect," "alter[ed] the legal regime" and had "direct and appreciable legal consequences." 520 U.S. at 158–59, 169, 178.

Here, the Supreme Court held that an earlier version of § 1862 "establishes clear preconditions to Presidential action" that include the Secretary's finding that imports threaten to impair national security. *Algonquin*, 426 U.S. at 549. And in the specific context of § 1862 as relevant here, we have explained:

> The statute indisputably incorporates a congressional judgment that <u>an affirmative finding of threat by the Secretary is the predicate for presidential action</u>, while also incorporating a congressional judgment that how to address the problem identified in the finding is a matter for the President, whose choices about remedy are not constrained by the Secretary's recommendations.

*Transpacific,* 4 F.4th at 1323 (emphasis added).  This pre-
condition to presidential action brings this case within *Co-
rus.*[4]

---

[4]    Judge Chen suggests that the decision in *Corus* is
inconsistent with *Franklin* and *Dalton.*  There is no incon-
sistency.  The Supreme Court itself in *Bennett* (where the
deciding authority could not act without a recommenda-
tion) explicitly distinguished *Franklin* and *Dalton* as rest-
ing on the advisory nature of the recommendations:

> [T]he Biological Opinion and accompanying Inci-
> dental Take Statement alter the legal regime to
> which the action agency is subject, authorizing it to
> take the endangered species if (but only if) it com-
> plies with the prescribed conditions. In this crucial
> respect the present case is different from the cases
> upon which the Government relies, *Franklin v.
> Massachusetts,* 505 U.S. 788 (1992), and *Dalton v.
> Specter,* 511 U.S. 462 (1994). In the former case,
> the agency action in question was the Secretary of
> Commerce's presentation to the President of a re-
> port tabulating the results of the decennial census;
> our holding that this did not constitute "final
> agency action" was premised on the observation
> that the report carried "no direct consequences"
> and served "more like a tentative recommendation
> than a final and binding determination." 505 U.S.,
> at 798. And in the latter case, the agency action in
> question was submission to the President of base
> closure recommendations by the Secretary of De-
> fense and the Defense Base Closure and Realign-
> ment Commission; our holding that this was not
> "final agency action" followed from the fact that the
> recommendations were in no way binding on the
> President, who had absolute discretion to accept or

---

reject them. 511 U.S., at 469–471. Unlike the re-
ports in *Franklin* and *Dalton,* which were purely
advisory and in no way affected the legal rights of
the relevant actors, the Biological Opinion at issue
here has direct and appreciable legal consequences.

*Bennett*, 520 U.S. at 178. The Secretary's finding here is
not merely advisory. As the Supreme Court held in *Algon-
quin*, the Secretary's threat finding is a "clear precondi-
tion[] to Presidential action." 426 U.S. at 559.

Nor is this a situation where the challenge is based on
procedural flaws in Commerce's approach. The absence of
such procedural flaws was not a condition of presidential
action in *Dalton*:

The President's authority to act is not contingent
on the Secretary's and Commission's fulfillment of
all the procedural requirements imposed upon
them by the 1990 Act. Nothing in [the relevant
statute] requires the President to determine
whether the Secretary or Commission committed
any procedural violations in making their recom-
mendations, nor does [the relevant statute] pro-
hibit the President from approving
recommendations that are procedurally flawed.

511 U.S. at 476. *See Silfab Solar*, 892 F.3d at 1347 (con-
firming that presidential action is not invalidated by pro-
cedural problems in a recommendation); *Michael Simon
Design, Inc. v. United States*, 609 F.3d 1335, 1341 (Fed. Cir.
2010) (same); *see also Motions Sys.*, 437 F.3d at 1362
("[B]ecause the acts of the Trade Representative were not
final actions, the Court of International Trade also lacked
jurisdiction to review those acts. Instead, the Trade Repre-
sentative's actions were analogous to those of the Secretary
in *Franklin,* a case in which the Secretary's report was 'like

The Trade Court's effort to distinguish *Corus*—on the ground that 19 U.S.C. § 2253(a)(1)(A) in *Corus* "does not give the President the option to accept or reject the finding of the Commission" but § 1862(c)(1)(A) (at issue here) does—is not well taken. *Universal Steel*, 495 F. Supp. 3d at 1345. That supposed distinction does not exist. Section 2253, like § 1862, gives the President the option to take no action, as demonstrated by the requirement that the President send a report to Congress when he decides not to act. *See* § 2253(b)(2). Thus, here as in *Corus*, the President is not compelled to act upon the recommendation of the Secretary, but an affirmative threat finding is a predicate to the President's authority to act under the statute. *See* § 1862(c)(1)(A); § 2253(b)(2); *Corus*, 352 F.3d at 1359. The fact that the Secretary's determination is not reviewable if the President takes no action does not defeat review of the Secretary's determination when the President does act based on the Secretary's report finding a threat to national security.[5]

Other cases have acknowledged that a predicate affirmative agency finding of an injury or threat, as in *Corus*, is reviewable. In *Silfab Solar*, we distinguished the

_____

a tentative recommendation' or 'the ruling of a subordinate official' because it was the President who carried the responsibility of transmitting the final report to Congress.").

[5]    As noted in *Silfab Solar*, review does not extend to cover procedural violations in the Secretary's determinations. *Silfab Solar*, 892 F.3d at 1347 (noting that "[n]othing in [the relevant statute] requires the President to determine whether the Secretary or Commission committed any procedural violations in making their recommendations, nor does [the relevant statute] prohibit the President from approving recommendations that are procedurally flawed") (alterations in original) (quoting *Dalton*, 511 U.S. at 476).

International Trade Commission's "affirmative finding regarding serious injury or the threat thereof," which was a "condition necessary for the President to take action" that was reviewable under *Corus,* from a remedy recommendation that was not a predicate to the President's authority to act and was not reviewable. *Silfab Solar*, 892 F.3d at 1346.

The situation here, where the Secretary's affirmative finding of a national security threat is a predicate to presidential authority, is distinguishable from the cases where the relevant statute lacked this type of condition on presidential action. *See, e.g.*, *Dalton*, 511 U.S. at 465–66; *Franklin*, 505 U.S. at 791–92. In the former, the agency action is reviewable; in the latter, it is not.

We conclude that the Secretary's threat determination under § 1862 is a reviewable final action because it is a predicate to the President's delegated authority to act under the statute.

## II

USP argues that the threat determination by both the President and the Secretary was contrary to the clear language of § 1862.[6] USP argues the "threat" must be "imminent" or "near at hand" and "likely to happen soon." Appellants' Br. at 31, 35–36. In other words, USP argues that the threat determination "inherently requires a serious risk near in time." Reply Br. at 11. USP relies on dictionary definitions to argue that the ordinary meaning of the term "threat" encompasses a "sense of likely harm" that is impending and

---

[6] In its brief, USP also argued at length regarding the timing requirements imposed on the Secretary and President in § 1862. However, at oral argument, USP's counsel admitted that the timing requirements were complied with. Oral Arg. at 1:42–2:51.

does not include "improbable, slight or remote risk[s]." Appellants' Br. at 30–31 (citing Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threat; Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/threaten).

Section 1862 imposes no imminence requirement. The factors that the President and Secretary are directed to consider in making their determinations do not mention imminence but focus instead on long term health of and adverse effects on the relevant domestic industry. § 1862(d). The identification of such factors in § 1862 is inconsistent with the notion that the threat must be imminent.

USP relies on *Goss Graphics Systems, Inc. v. United States*, 216 F.3d 1357, 1362 (Fed. Cir. 2000), and *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994), both of which recognized an imminence requirement. Appellants' Br. at 31. But those cases involved a different statute, which specifically required that "the threat of material injury is real and that actual injury is imminent." *Suramerica*, 44 F.3d at 983 (quoting 19 U.S.C. § 1677(7)(F)(ii) (1993)); *Goss*, 216 F.3d at 1362. That statute has no relevance here. If anything, it shows that when Congress wanted to impose an imminence requirement, it said so explicitly.

Because § 1862 provides no basis to impose an imminence requirement, USP's argument that the President's and the Secretary's determinations violated the statute is unsupported.

USP does not challenge the President's determination for any reason other than the alleged statutory violation.[7]

---

[7]     The President's actions "are not reviewable under the APA" because "the President is not an 'agency.'" *Dalton*, 511 U.S. at 470; *see Franklin*, 505 U.S. at 796 ("We

Nor could it because § 1862 commits to the President the discretion to "determine whether [he] concurs" with the Secretary's threat finding. § 1862(c)(1)(A)(i). Such determinations committed to the President's discretion are beyond our jurisdiction to review. *See Dalton*, 511 U.S. at 474; *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940); *Silfab Solar*, 892 F.3d at 1349. Because § 1862(c) grants the President discretion, how he "chooses to exercise the discretion Congress has granted him is not a matter for our review." *Dalton*, 511 U.S. at 476.

USP separately criticizes the Secretary's threat determination as unsupported by substantial evidence. But the Secretary's threat determination is not reviewable under the APA arbitrary and capricious standard. This is so because the standard governing the Secretary's action is the same as for the President's action (i.e., the existence of a "threat"), and the President's action is only reviewable for compliance with the statute. Under such circumstances, the threat determinations of the President and the Secretary are reviewed together as a single step using an identical test under the Supreme Court's decision in *Bush*. As explained in *Bush*, where the Court addressed the requirements of a statute similar to § 1862, "the action of the Commission and the President is but one stage of the legislative process." 310 U.S. at 379. The Supreme Court in *Bush* applied the same deference to both the Tariff Commission's report and the President's determination. *Id.* at 380. We must do so here as well. The Secretary's threat

_____

hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards."); *Motions Sys. Corp.*, 437 F.3d at 1359 ("Motion Systems acknowledges that it cannot challenge the President's actions under the APA because the President is not an 'agency.'").

USP HOLDINGS, INC. v. US

determination is not subject to review except to determine compliance with the statute.

### III

USP alleges that the President failed to satisfy the "nature and duration" requirement in § 1862(c)(1)(A) with Proclamation 9705. Unlike the threat determination, which included the Secretary's predicate finding, the nature and duration of the action is committed to the President, and the Secretary plays no part. § 1862(c). Thus, we review only the President's action. As discussed above, we review the President's action for compliance with the statutory authority delegated to him by Congress.

The statute here grants the President discretion to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports" to address imports that threaten national security. § 1862(c)(1)(A)(ii).[8] USP argues that the President's action failed to satisfy the requirements of § 1862(c)(1)(A) because "Proclamation 9705 did not indicate any kind of time period during which these import adjustments would last" and failed to set an end date or other criteria. Appellants' Br. at 29. The statute includes no limits on the duration of the action.

This court recently addressed the President's authority to act under § 1862(c) in *Transpacific*. There, following the same investigation, report, and Proclamation 9705 for steel

---

[8] USP suggests that the change in the statutory text in 1988 from "take such action, and for such time" to "determine the nature and duration of the action" indicates an intention to restrict the President's authority. Appellants' Br. at 20–28; Appellees' Br. at 30. In *Transpacific*, we held that this change was "stylistic." 4 F.4th at 1326, 1329 (quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 343 n.3 (2005)).

imports at issue here, the President issued a later procla-
mation that doubled the tariff on steel imports from Tur-
key. *Transpacific*, 4 F.4th at 1309–10. Transpacific
challenged whether the timing requirements in
§ 1862(c)(1) "permit[] the President to announce a continu-
ing course of action within the statutory time period and
then modify the initial implementing steps in line with the
announced plan of action by adding impositions on imports
to achieve the stated implementation objective." *Id.* at
1318–19. This court upheld the increased tariff on Turkish
steel and explained:

> [W]e conclude that the best reading of the statutory
> text of § 1862 . . . is that the authority of the Presi-
> dent <u>includes authority to adopt and carry out a</u>
> <u>plan of action that allows adjustments of specific</u>
> <u>measures</u>, including by increasing import re-
> strictions, in carrying out the plan over time.

*Id.* at 1319 (emphasis added). Thus, under *Transpacific*,
§ 1862(c)(1)(A) permits the President to adjust actions af-
ter taking the "first step" in a continuing course of action.
83 Fed. Reg. 11,625, ¶ 11.

Given our holding that the President has the "author-
ity to adopt and carry out a plan of action" and to adjust his
ongoing approach under § 1862(c), we see no reason why
the duration requirement in § 1862(c)(1)(A) must be fixed
by an end date or termination criteria. *Transpacific*,
4 F.4th at 1319. If the President has authority to under-
take a plan of action that includes adjusting tariffs over
time, then the President must also have authority to un-
dertake a plan of action that includes imposing a tariff in-
definitely and removing it at a later time once the
President determines that it is no longer necessary. Sec-
tion 1862 commits the determination of the "nature and
duration of the action" to the "judgment of the President."
§ 1862(c)(1)(A)(ii). And Congress intended that authority
to be "continuing." H.R. Rep. No. 84-745, at 7 (1955). The

statute does not limit the President's authority to establishing a set term, and the proclamations here do not violate the statute. The amendments to § 1862 in 1988 imposing strict time limits on the President's action were enacted in response to prior failures to act decisively and in a timely manner and do not suggest that the President lacks authority to revise his actions at a later time.

USP does not argue that the President's action, if consistent with the statute, is impermissible. Again, this is a matter committed to the President's discretion, and the President's exercise of his judgment to "determine the nature and duration" of the action he believes necessary is beyond the scope of our review. *See Dalton*, 511 U.S. at 474; *Bush*, 310 U.S. at 379–80; *Transpacific*, 4 F.4th at 1319; *Silfab Solar*, 892 F.3d at 1349.

CONCLUSION

We have authority to review the determinations by both the President and the Secretary that steel imports threaten national security and the determination by the President to set a steel tariff for an indefinite duration. We find no violations of the statute.

**AFFIRMED**

COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

————————————

**USP HOLDINGS, INC., SUBSTITUTED FOR
UNIVERSAL STEEL PRODUCTS, INC., PSK STEEL
CORPORATION, DAYTON PARTS, LLC, BORUSAN
MANNESMANN PIPE U.S. INC., JORDAN
INTERNATIONAL COMPANY,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, JOSEPH R. BIDEN, JR.,
PRESIDENT OF THE UNITED STATES, GINA M.
RAIMONDO, SECRETARY OF COMMERCE, TROY
MILLER, SENIOR OFFICIAL PERFORMING THE
DUTIES OF THE COMMISSIONER FOR U.S.
CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellees*

————————————

2021-1726

————————————

Appeal from the United States Court of International
Trade in No. 1:19-cv-00209-GSK-MMB-LMG, Senior Judge
Leo M. Gordon, Judge Gary S. Katzmann, Judge M. Miller
Baker.

————————————

CHEN, *Circuit Judge*, additional views.

As to the question of whether the Commerce Secre-
tary's threat determination under 19 U.S.C. § 1862 is a ju-
dicially reviewable final agency action, I agree with the

panel's decision because the relevant facts are essentially the same as facts in *Corus Group*. *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359 (Fed. Cir. 2003). However, I write separately to express concern that *Corus Group* is inconsistent with Supreme Court precedents on the non-finality of a Secretary's or Commission's tentative report and recommendation to the President.

The "core question" for determining finality is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Dalton v. Specter*, 511 U.S. 462, 470 (1994) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)). In both *Franklin* and *Dalton*, the Supreme Court held that the Secretary's or Commission's report and recommendations to the President did not constitute final agency action, reviewable under the APA, because those recommendations were not themselves binding actions that directly affected the parties.

In *Franklin*, the Commerce Secretary's decennial census report had "no direct effect on reapportionment until the President [took] affirmative steps to calculate and transmit the apportionment to Congress." 505 U.S. at 799. The President was not bound by the data in the Secretary's report; rather, the decennial census was a "moving target" subject to correction by the President. *Id.* at 797. The Court observed that the report, therefore, "carrie[d] no direct consequences for the reapportionment of Representatives" and "serve[d] more like a tentative recommendation than a final binding determination," like a "ruling of a subordinate official." *Id.* at 798 (internal quotation marks omitted). The Court distinguished the situation from *Japan Whaling Ass'n*, where the Secretary's certification "automatically triggered sanctions . . . regardless of any discretionary action the President himself decided to take." *Id.* at 798–99 (citing 478 U.S. 221 (1996)). Under *Franklin*, a Secretary's report and recommendation to the President is not reviewable final agency action if presidential action

is necessary to cause the ultimate entitlement or impact on rights and where the President has discretion to revise the Secretary's findings.

In *Dalton*, the Supreme Court again found that recommendations to the President were not reviewable final agency action. With the Defense Base Closure and Realignment Act of 1990, Congress designed an elaborate selection process for the fair and timely closure and realignment of military bases. *Dalton*, 511 U.S. at 464. The process involved the Defense Base Closure and Realignment Commission submitting a report that recommended base closings and realignments. *Id.* at 465. The President was required to either approve or disapprove the Commission's recommendations "in their entirety." *Id.* If the President disapproved, the Commission could prepare a new report to submit to the President. *Id.* If the President again disapproved, no bases could be closed that year. *Id.* In *Dalton*, the Commission had recommended closing the Philadelphia Naval Shipyard and the President approved. *Id.* at 466. The Supreme Court held that the Commission's report was unreviewable because, as in *Franklin*, the report carried "no direct consequences for base closings." *Id.* at 469. The Court found "immaterial" the fact that the President was constrained to either entirely approving or disapproving the Commission's recommendation. *Id.* at 470–71. The Court emphasized: "Without the President's approval, no bases are closed under the Act" and, furthermore, "the Act, in turn, does not by its terms circumscribe the President's discretion to approve or disapprove the Commission's report." *Id.* at 470. "[M]ore fundamentally," with regard to the action that "will directly affect the parties," it is "the President, not the Commission, [who] takes the final action that affects the military installations." *Id.* (internal quotation marks omitted). *Dalton*, in short, reaffirmed that a report or recommendation to the President is not a final agency action if no direct

consequences occur without the President's action and if the President has discretion in whether to take action.

Setting aside *Corus Group*, our case would be a straightforward application of *Franklin* and *Dalton*. Before any action "to adjust the imports of the article and its derivatives" is taken, the President must concur with the Secretary of Commerce's finding that the imported article threatens to impair the national security and determine the appropriate duration or action. 19 U.S.C. § 1862(c)(1)(A). But the President can choose to disagree with the Secretary's findings and refuse to take action. *Id.* § 1862(c)(1)(A)(i) ("whether the President concurs with the finding of the Secretary"); *id.* § 1862(c)(1)(A)(ii) ("if the President concurs"); *id.* § 1862(c)(2) ("the President shall submit to the Congress a written statement of the reasons why the President has . . . refused to take action"). In which case, there are no direct consequences from the Secretary's report and recommendation regarding the imported article and the imposition of tariffs. Further, even when the President concurs and takes action, there are almost no limits to the President's discretion except that the President give consideration to certain factors—more discretion than the President had in *Dalton*. *See* Oral Arg. 17:30–17:49; 19 U.S.C. § 1862(d) (listing factors the President "shall . . . give consideration to"). Because the Secretary's report and recommendation by themselves carry no direct consequences for or effect on any party, under *Franklin* and *Dalton*, the report and recommendation should constitute unreviewable, non-final agency action.

But in *Corus Group*, this court held that the Commission's report and recommendation under a very similar statute, 19 U.S.C. § 2253, was reviewable because "the statute only gives the President authority to impose a duty if the Commission makes 'an affirmative finding regarding serious injury.'" *Corus Grp.*, 352 F.3d at 1359 (quoting 19 U.S.C. § 2253(a)(1)(A)). The court held that this "affirmative finding" prerequisite to presidential action meant the

Commission's report and recommendation had "direct and
appreciable legal consequences" and the President's action
was nondiscretionary, thus making the Commission's re-
port and recommendation reviewable. *Id.* at 1358–59. Be-
cause *Corus Group* held as such, and because the statute
in this case is identically structured, where the Commerce
Secretary must make an affirmative finding of a threat-
ened impairment to national security before the President
can act, I join the panel opinion. Nevertheless, by treating
one particular type of Secretary or Commission recommen-
dation report differently from all other Secretary or Com-
mission recommendation reports for purposes of
reviewability, I view *Corus Group*'s reasoning inconsistent
with the analysis in *Dalton* and *Franklin*. *Dalton*, in par-
ticular, demonstrates the fact that the President lacks the
authority to act (to close bases) absent prerequisite find-
ings and recommendation by a Secretary or Commission is
immaterial to determining whether the Secretary's or
Commission's findings and recommendation is a final ac-
tion. 511 U.S. at 470–71. The Supreme Court's test of
whether the action "will directly affect the parties" does not
involve looking at whether the President's authority to act
is affected. *Id.* at 469.

Nor does the Supreme Court's *Bennett* decision, which
*Corus Group* relied on, suggest otherwise. *Corus Grp.*, 352
F.3d at 1359 ("We conclude also that this case is controlled
by *Bennett*, rather than by *Dalton* and *Franklin* . . . ."). Un-
like *Franklin* and *Dalton*, *Bennett* did not involve an
agency making a tentative recommendation to the Presi-
dent but a determination of one agency's entitlement by an-
other. In *Bennett*, the Fish and Wildlife Services (FWS)
issued a determination on another agency's actions and
their impact on threatened and endangered species of ani-
mals. FWS's determination created a legal burden and
specific liabilities that, thereby, determined the other
agency's rights and obligations. *Bennett v. Spear*, 520 U.S.
154, 169–70 (1997) (explaining that once a biological

opinion issues, the agency subject to the opinion "bears the burden of 'articulating in its administrative record its reasons for disagreeing with the conclusions of a biological opinion'" and though free to disregard the biological opinion, the agency "does so at its own peril" subject to substantial civil and criminal penalties including imprisonment); *id.* at 178 (finding the action is "one by which rights or obligations have been determined" because the "Biological Opinion and accompanying Incidental Take Statement alter the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions"). Accordingly, the Supreme Court found that FWS's determination was a final agency action, specifically distinguishing it from the reports and recommendations to the President in *Franklin* and *Dalton*, which were "more like a tentative recommendation than a final and binding determination." *Id.* at 177–78 (internal quotation marks omitted).

We have applied *Franklin* and *Dalton*, in other cases involving tentative reports and recommendations to the President, to find that the reports and recommendations are non-final and thus unreviewable. In our en banc decision in *Motions Systems*, we held that the acts of the Trade Representative under 19 U.S.C. § 2451, involving recommendations on the prevention or remedy of market disruption, which the President had ultimate discretion over, were not final actions. *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1359, 1362 (Fed. Cir. 2006) (en banc). Similarly, in *Michael Simon Design*, the International Trade Commission's report and recommendations to the President regarding modifications to the Harmonized Tariff Schedule of the United States (HTSUS) were non-final and unreviewable. *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1338–40 (Fed. Cir. 2010). Like in our case, the report and recommendations were "purely advisory" and did not "contain terms or conditions that circumscribe the President's authority to act," "limit the President's

potential responses," nor "directly modify the HTSUS" and, therefore, did not "directly impact legal rights or alter any legal regime"—even if 19. U.S.C. § 3006 required the President to receive recommendations from the Commission before proclaiming any modification.  *Id.* at 1336, 1339–40; 19 U.S.C. § 3006(a) ("The President may proclaim modifications, based on the recommendations by the Commission . . . .").

Accordingly, although I agree that this panel is bound by *Corus Group*, I write to express concern that *Corus Group* was, and our decision in this case is, incorrectly decided under Supreme Court precedents *Franklin* and *Dalton*.